**Salvatore and Hilda LAURENZANO, Plaintiffs-Appellants,**

**v.**

**Alvin H. EINBENDER et al., Defendants-Respondents,**
**and**
**Retail Centers of the Americas, Inc., Defendant.**

**No. 472, Docket 35405.**

United States Court of Appeals, Second Circuit.

Argued May 4, 1971.

Decided Sept. 3, 1971.

**2**

Sidney B. Silverman, New York City (Joan T. Harnes, New York City, of counsel), for plaintiffs-appellants.

I. Meyer Pincus, New York City (Rapoport, Rubino & Pincus, New York City, Jay W. Seeman, New York City, of counsel), for defendants-respondents.

Before LUMBARD, SMITH and KAUFMAN, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

Plaintiffs-appellants, shareholders in Retail Centers of the Americas, Inc. (formerly known as Bargain Town, USA,

Inc. and referred to herein as "Bargain Town")[1] appeal from a judgment in the United States District Court for the Eastern District of New York (John F. Dooling, Judge), dismissing their derivative and class actions after a non-jury trial. Plaintiffs had brought this action against National Industries, Inc. ("National"), as majority shareholder in Bargain Town, Bargain Town's former controlling shareholders Solomon S. Dobin and Jack Horne, and all but one of Bargain Town's directors at the time of the challenged transactions.

Plaintiffs alleged that Bargain Town had issued a false and misleading proxy statement, in violation of section 14 of the Securities Exchange Act of 1934, 15 U.S.C. § 78n, and Rule 14a–9 (17 C.F.R. 240.14a–9). It was further charged that the issuance of the false and misleading proxy statement violated Rule 10b–5 (17 C.F.R. 240.10b–5), since it was issued in connection with the purchase and sale of securities. Finally, it was contended that most of the transactions which formed the subject matter of the proxy statement were unfair. Defendants' pretrial motion to dismiss the amended complaint was denied by Judge Dooling.[2] This court left all issues raised by that motion and the decision thereon for future consideration, without prejudice.[3]

After trial, Judge Dooling found against plaintiffs on each of their claims, in a thorough and highly detailed opinion. We find no error in either his factual or legal conclusions, and affirm the judgment.

Bargain Town was founded in the early 1950's by defendants Dobin and Horne. At that time it consisted of one discount retail store in Brooklyn, but by 1964 it had five stores in operation—two in Puerto Rico, one on Long Island, one in Norwalk, Connecticut, and the original store in Brooklyn. In 1961 a public offering of Bargain Town shares had been made, but Dobin and Horne and persons affiliated with them retained control (approximately 72% of the shares of common stock outstanding). Although the corporation had been in continual expansion, toward the end of 1964 its management believed that a loss for the year was likely. A significant cause of this decline was the apparent failure of the Brooklyn store. Additionally, the Norwalk store was encountering serious financial and managerial difficulties. Troubles were compounded as a result of the development of a strong difference over the philosophy of management between Dobin and his executive vice-president, King.

Because of these ever-increasing problems, defendant Dobin decided to sell out his stock interest and leave the retail business entirely. After consultation with Bargain Town's counsel (who also served as a director of the corporation), Dobin concluded that his group would sell at $4.00 a share, approximately $2.00 below the price at which Bargain Town's stock was being traded on the American Stock Exchange, and approximately equal to the book value of Bargain Town's stock.

Defendant Einbender, a director and official of National, agreed to have National purchase the Dobin group's stock, if the Brooklyn and Norwalk operations could be eliminated, and if Executive Vice-President King could be induced to stay on. In order to make a deal, the Dobin group was required to take over the Brooklyn and Norwalk stores at book value in exchange for redemption by Bargain Town of some of the Dobin stock. An option agreement between National and the Dobin group was executed on September 3, 1964. The agreement gave National the option to purchase all of the Dobin shares, less a number equal to the book value of the Brooklyn and

1. Bargain Town and National Industries, Inc. merged on or about July 1, 1968, after this action had been pending. The parties stipulated, however, that the present action "shall survive the merger."

2. 264 F.Supp. 356 (E.D.N.Y.1966).

3. CCH Fed.Sec.L.Rep. ¶ 91,846, at 95,900 (1966).

Norwalk assets (known collectively as "the Buy-Rite Assets"), divided by $4.00 per share. To exercise this option, National was required to execute a binding purchase agreement for the Dobin shares. Such exercise could not become effective, however, unless the Bargain Town Board, subject to shareholder approval, had agreed to redeem the remaining Dobin shares in exchange for the Buy-Rite Assets. Bargain Town itself was not a party to the option agreement, but the directors of Bargain Town had been made aware of its existence.

On October 7, 1964, National exercised its option, buying 690,100 of the Dobin group's shares. Thereafter National owned a majority interest in Bargain Town. Dobin and his associates resigned from the Bargain Town Board, and the remaining members authorized the execution of the redemption agreement. This agreement provided for the exchange of the Buy-Rite Assets at net book value for the Dobin group shares valued at $4.00 per share. In accordance with the valuation of Peat, Marwick, Mitchell & Co., independent accountants, the net book value of the Buy-Rite Assets was estimated at $1,178,427.90, or 294,606 shares of Bargain Town stock, valuing the stock at $4.00 per share.

Before the proxy statement requesting shareholder approval for this transaction was prepared, the Board obtained an appraisal of its Brooklyn real estate by an independent appraiser, Wittman, who concluded that the value of the property was $360,000—$39,000 more than its book value. On the same date it approved the Dobin redemption, the Bargain Town Board formally authorized negotiations for the purchase of G.E.S., a corporation which operated three closed-door membership department stores. Patronage at these stores was limited to "members" and their families; membership was obtained by paying what Judge Dooling characterized as a "trifling fee," though it was theoretically limited to select groups of individuals. Store sales were generally made by concessionaires. G.E.S. had been formed by

Einbender in 1960, and had been sold to National in June of 1964. National had decided to offer G.E.S. for sale to Bargain Town, apparently believing it preferable to centralize its retail store activities in one entity.

National authorized the sale of G.E.S. at a price to be established by independent appraisers, but in no event less than $2.1 million. Einbender suggested Leonard Marx, of Marx Realty, an independent appraiser of national reputation, as the best qualified individual to make the appraisal. G. A. Saxton & Co., a Wall Street investment house which had done work in the insurance company field for National was also retained. Judge Dooling found that Einbender did not retain Marx until satisfied that his estimate would be sufficiently high to meet National's minimum acceptable price, but he emphasized that "[t]here are no circumstances that suggest that, or evidence that supports an inference that, the opinion [Marx] expressed did not reflect his considered judgment." Marx's final estimate was that G.E.S. was worth $2.1 million. The Saxton estimated value was $2.2 million. Though Judge Dooling found that "[t]here is every indication that the Saxton opinion was hasty and somewhat superficial," he concluded that "the Saxton opinion was not a procured thing, nor is there any basis for finding it wide of the mark."

The Board of Bargain Town agreed to purchase G.E.S. for $2.1 million. At the same meeting, the Board decided that it would sell convertible debentures in the amount of $2,250,000 at an interest rate not to exceed 5¾%. The Board then directed that both transactions were to be submitted to the shareholders for their approval.

On January 14, 1965, the recommended transactions were approved by the shareholders, National's votes alone, of course, being enough to carry the proposals. Roughly one-fourth of the independent shares were voted by proxy, and of these over 90% approved the proposals. It is plaintiffs' primary con-

tention that the proxy statement provided to the shareholders before the vote was materially misleading and false. First, it is contended that failure of the statement to indicate the existence of the option agreement between the Dobin group and National was unduly misleading. As noted previously, however, Bargain Town was not a party to this agreement, nor was it in any way bound by it. Plaintiffs' claim that as a result of this option agreement National somehow had available the means to guarantee Board approval is groundless. The independent members of the Board continued to serve, and there was no proof of any undue pressure placed upon them by National. The existence of the option agreement was therefore not a material fact requiring disclosure. The further argument, that Bargain Town shareholder approval was meaningless because National was now the majority shareholder, is irrelevant to the question of whether or not the existence of the option agreement had to be revealed in the proxy statement. And, of course, approval was not meaningless; minority shareholder approval has value whether or not it is strictly essential to the power to act.

■ Second, plaintiffs argue that failure to state National's intended method of financing its stock purchase of the Dobin group's shares was a material omission. It is contended that National intended to use the funds acquired as a result of the sale of G.E.S. to finance its Dobin stock acquisition. National's plans for the money received from the G.E.S. sale, however, cannot reasonably be said to meet the test of materiality employed in this circuit, as stated in General Time Corp. v. Talley Industries, Inc., 403 F.2d 159, 162 (2d Cir. 1968), cert. denied, 393 U.S. 1026, 89 S.Ct. 631, 21 L.Ed.2d 570 (1969):

> The test * * * is whether, taking a properly realistic view, there is a substantial likelihood that the misstatement or omission may have led the shareholder to grant a proxy to the solicitor * * * whereas in the

absence of this he would have taken a contrary course.

We cannot agree with plaintiffs that such a revelation would be likely to change any rational minds. Of primary interest to Bargain Town's shareholders was the value of G.E.S. to Bargain Town, and the reasonableness of the price in light of that value. National's own motivations for entering into the deal were of no consequence.

■ Plaintiffs' third claim of material misrepresentation concerns the participation of Einbender at the Bargain Town Board meeting of November 11, 1964, at which time the Board approved the purchase of G.E.S. After National's purchase of the Dobin group's stock, Einbender had become Chairman of the Bargain Town Board, though he remained an officer and director of National. He attended the meeting in question but, according to the proxy statement, "did not participate in the discussion" of the proposed transaction "nor did he vote thereon." In addition, the proxy statement explained the dual role served by Einbender at that time. According to plaintiffs, Einbender initiated the first discussion of the G.E.S. sale, discussed the purchase with each of Bargain Town's directors, and retained and influenced the appraisers. Defendants now admit that Einbender "provided information and answered questions" and "stated what he believed to be the advantages to Bargain Town of the purchase of G.E.S." Defendants' claim that the sentence in the proxy statement that "he did not participate in the discussion" clearly meant simply that he did not act as an advocate or press a position is open to question. However, this statement does not meet the materiality standard laid down in *General Time, supra,* since it is clear from the record and from Judge Dooling's findings of fact that the independent directors of Bargain Town all held the firm belief that the acquisition of G.E.S. was in the best interests of Bargain Town. Absent convincing evidence that Einbender encouraged the independent directors to vote

for the purchase of G.E.S. on the basis of inaccurate information, the fact that Einbender actually had advocated the purchase cannot be deemed material.

■ Plaintiffs' final claim of misrepresentation concerns the function and use of expert opinion. It is contended that mention of the use of Saxton and Marx as independent appraisers was intended to allay stockholder doubt and to create a false atmosphere of confidence. Yet, plaintiffs argue, the Marx report was not even completed at the time Bargain Town's Board approved the purchase of G.E.S. Further, it is charged that the Saxton report was incomplete, prepared by a totally inexperienced individual, and disregarded by the Board members in reaching their decision to purchase.

Judge Dooling concluded, however, that "[t]he statement * * * about the Saxton and Marx reports was, on the evidence, not intended to mislead." According to his findings of fact, the directors truthfully testified that they thought the statement expressed the matter adequately, and we cannot characterize such a factual conclusion as clearly erroneous. All the proxy statement claims in regard to this is that because of the impossibility of arms' length negotiation resulting from National's controlling influence in Bargain Town, experts were engaged "to assist in reviewing * * * relevant factors and to appraise the fair value of the G.E.S. stock. Based upon such factors, the Board concluded that the fair value thereof is $2,100,000." This representation does no more than indicate what actually took place, and does not unduly emphasize the influence or thoroughness of the expert opinions.

Plaintiffs also challenge the characterization in the proxy statement of the Wittman appraisal of the Brooklyn property. The proxy statement makes the following representation on this matter:

In connection with the determination of the value of the assets of Holding Corp. (now Buy-Rite) and its subsidiary, the Board obtained a written appraisal from Frank Wittman, of 10 East 40 Street, New York, N. Y., real estate appraiser, and on the basis of such appraisal is satisfied that the fair value of the assets of Holding Corp. is approximately equal to the net book value thereof on the books of Buy-Rite and/or Broadway Lawton Corp. [Proxy statement, at 4.]

As plaintiffs emphasize and as Judge Dooling found as fact, the Wittman report (in Judge Dooling's words) "was not requested and made until long after the Directors * * * had approved the transaction." But this fact is not necessarily inconsistent with the terms of the proxy statement. The representation may be taken to mean that the Wittman report merely confirmed the views of the directors as to the value of the Brooklyn property. As Judge Dooling concluded, the critical point "is whether the Wittman report played a part that was fairly represented, not whether it played that part at or before [the date of Board approval of the transaction]."

Judge Dooling further found that the evidence did not support a finding that the Wittman appraisal was a basis upon which the directors initially satisfied themselves that the fair value of the Buy-Rite Assets approximately equalled the net book value of the assets. But it was also concluded that the directors had at least considered the report and had found nothing in it to change their attitudes. As noted previously, the representation in the proxy statement may be construed to mean just this. Though one might have hoped for a more clearly phrased explanation of the role played by the Wittman report in the decision concerning valuation, the conclusion of Judge Dooling that use of clearer phraseology would not have been materially different in verbal impact is sustainable.

■■ In addition to challenging the accuracy of the proxy statement, plaintiffs question the fairness of the transactions themselves. The claim is made that the exchange of the Buy-Rite Assets for the Dobin group's stock was un-

fair since the real estate was undervalued on the books, and nothing was paid for going-concern value. It should be noted, however, that the exchange price for the Dobin group stock was $4.00 per share, $2.00 below the stock's apparent market value at the time. Both the Norwalk and Brooklyn stores had suffered recurrent business losses, the Brooklyn store in particular was in a rapidly deteriorating neighborhood and the Norwalk store was burdened with an onerous lease. As defendants argue, even if plaintiffs are correct in their contention that the Brooklyn real estate was undervalued (which is by no means clearly established), this factor, which constituted only one element of a larger transaction concerning and affecting numerous other interests, does not necessarily render that transaction fraudulent or unfair. Certainly there is no basis for holding clearly erroneous Judge Dooling's finding that "[t]he evidence supports, indeed requires, the conclusion that the transactions do not reflect any intention to overreach, consciousness of overreaching, or unfairness in terms on the part of any participant." The fact that other terms might also have been considered fair, or even more desirable, does not mean that the terms actually decided upon are unfair.

We reach the same conclusion as to plaintiffs' contention that Bargain Town paid an unfair price for G.E.S. That price, it will be recalled, was $2.1 million. Plaintiffs contend that two reasonably contemporaneous sales of G.E.S. stock should have determined the price to be paid by Bargain Town. These sales, according to plaintiffs, were disregarded by Marx in making his valuation. One of these sales occurred in late May, 1964, when Einbender, the founder of G.E.S., sold a 16½% interest for $257,000, indicating an over-all value of $1,558,000 for all of G.E.S. The other was the purchase of G.E.S. by National in June of that year for 220,400 shares of National's unlisted, restricted stock. The court, in reflecting upon the valuation of G.E.S., noted this sale, but considered the value of the National shares at a price not discounted because of the existence of restrictions on the sale of the stock. Applying an undiscounted rate, the value derived by analogizing to the purchase by National is $2,446,000.

Plaintiffs argue, however, that because of the existence of the restrictions and the fact that the National shares were unlisted, the value of those shares should have been specially discounted. It is true that generally, restricted securities cannot as readily be sold in the public market as freely salable securities. The fact remains, however, that Bargain Town's directors recognized the need to acquire earnings and improve management, problems which they could reasonably conclude might be helped by the acquisition of G.E.S. Though perhaps some discount should have been applied, given these facts concerning the special benefits to Bargain Town from the purchase of G.E.S., the discount rate need not be as steep as plaintiffs argue it should be—more than 25%. A discount of up to 14% could be applied to the National stock received in exchange for G.E.S. and the value of G.E.S. would not fall below $2.1 million, the actual purchase price. In any case, the existence of these special values to Bargain Town in the business context of the purchase indicates that plaintiffs are incorrect in arguing that two contemporaneous sales of G.E.S. stock mechanically determine the proper sale price to be paid by Bargain Town. Additionally, there existed two appraisals of G.E.S. by what Judge Dooling found to be independent appraisers which placed the value at a minimum of $2.1 million, a figure which Judge Dooling found to be reasonable and accurate. Though Judge Dooling found and defendants admit that neither report is free from error, we cannot say that the finding that such appraisals were not inaccurate is clearly erroneous.

The findings of fact and conclusions of law reached by the district court on careful consideration after an extended trial are supported by the record. The judgment is affirmed.