John SCHLICK, Plaintiff-Appellant,

v.

PENN–DIXIE CEMENT CORPORA-TION et al., Defendants-Appellees.

No. 1009, Docket 73–2677.

United States Court of Appeals, Second Circuit.

Argued Aug. 13, 1974.

Decided Oct. 31, 1974.

Jeffrey L. Zivyak and Ira W. Berman, New York City, for plaintiff-appellant.

Marc P. Cherno, New York City (Joseph H. Einstein, Alan J. Russo, New York City, of counsel), for defendants-appellees.

Amicus Brief filed by S. E. C. (Lawrence E. Nerheim, Gen. Counsel, Walter North, Associate Gen. Counsel, Frederic T. Spindel, Sp. Counsel, Frederick B. Wade, Atty., Securities and Exchange Commission, Washington, D. C.).

Before OAKES, Circuit Judge, and FRANKEL and KELLEHER, District Judges.*

OAKES, Circuit Judge:

This appeal is from a judgment dismissing a complaint for failure to state a claim upon which relief may be granted under Fed.R.Civ.P. 12(b)(6). The action is one for damages for alleged violations of the federal securities laws,[1] brought by a minority shareholder[2] of Continental Steel Corporation (Continental), an Indiana corporation listed on the New York Stock Exchange (NYSE). The alleged violations arose in connection with a merger of Continental into a wholly owned subsidiary of defendant Penn-Dixie Cement Corporation (Penn-Dixie), also listed on the NYSE.

The dismissed complaint alleges that between October, 1967, and October, 1969, Penn-Dixie acquired 1,111,514 shares or approximately 52.9 per cent of the outstanding common stock of Continental. Having thus acquired voting control over Continental, Penn-Dixie instituted management control over the corporation by placing six of its directors and officers on Continental's nine member board of directors. Appellant claims that Penn-Dixie then exercised its control of Continental so as to defraud Continental shareholders.

Generally, Penn-Dixie is said to have manipulated and depressed the market value of Continental stock in relation to that of Penn-Dixie by utilizing Continental's assets for the benefit of Penn-Dixie and to have caused Continental to enter into a merger agreement providing for an unfair exchange ratio based upon manipulated and artificial stock values of the merging parties. On March 14, 1973, the boards of directors of both companies unanimously approved an agreement of merger[3] by which Continental shareholders would receive in exchange for each share of Continental

\* Of the Southern District of New York and the Central District of California, respectively, sitting by designation.

1. Jurisdiction is based upon Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa (1970), which gives to the district courts jurisdiction over actions brought to enforce any liability or duty under the act irrespective of the amount in controversy or the citizenship of the parties.

2. Appellant Schlick sues for himself individually and on behalf of all purchasers of Continental similarly situated. Appellees include Penn-Dixie and several officers and directors of both Penn-Dixie and Continental.

3. Since under Indiana law, a majority vote of the outstanding shares of a corporation is sufficient to secure shareholder approval of a merger, Burns, Ind.Stat.Ann. Title 23, art. I, ch. 5, § 2(b) (1972), and since Penn-

one and one-half shares of Penn-Dixie common stock and a warrant [4] to purchase an additional share of Penn-Dixie. In connection with the merger the complaint further alleges that Penn-Dixie issued a materially defective proxy statement which failed to disclose the manner in which Penn-Dixie had inflated the value of its shares at the expense of Continental. Damages claimed are in an indeterminate amount set at no less than $10 per Continental share, representing the difference in value between the value of the Continental shares in the actual merger and what they would have been worth but for the manipulations of Penn-Dixie.

On the basis of these general obligations, the complaint contains four claims of relief, in separate counts. The first alleges a violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1970), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.-10b–5 (1974); count two claims a violation of the proxy solicitation provision of Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a) (1970), and Rule 14a–9 thereunder, 17 C.F.R. § 240.14a–9 (1974); the third and fourth counts of the complaint are common law counts based upon fraud and unfairness, each of which is pendent to the federal claims. Thus the whole complaint must fail unless one of the federal counts is viable. United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

The district court found that the proxy count of the complaint was defective in that it failed to present "any allegation of injury which was caused by the proxy violations, aside from that claimed to flow from the unequal ratios." Schlick v. Penn-Dixie Cement Corp., No. 73, Civ. 1467 (S.D.N.Y., decided Sept. 26, 1973). In effect, the district court seemed to be saying that the appellant failed to show that the appellees' misstatements or omissions contributed to the kind of injury which the federal securities laws were intended to redress.[5]

In reaching this conclusion, the district court relied heavily on the fact that the allegedly false and misleading proxy statement did not cause Continental minority stockholders any harm other than that caused by the unfair exchange ratio. They were not misled about their rights so as to have failed to take protective action in the form of seeking injunctive relief; rather, the court below continued, appellant chose to bring this action for damages before the merger was finalized. Nor did the complaint allege that other rights such as appraisal rights were lost as a result of appellees' action.[6] On such a showing, the district court regarded the appellant's proxy claim as one based upon what was alleged merely

---

Dixie possessed that majority, the merger was consummated on May 11, 1973, while this suit was pending.

4. This exchange ratio was "arrived at by considering, among other factors, the earnings prospects, book values, and the market prices of the common stock of both companies" (Joint Proxy Statement at 3). Each warrant entitles the holder to purchase one share of Penn-Dixie common stock for $8 per share through May 1, 1978, and for $11 per share thereafter until an expiration date of May 1, 1983.

5. It is unclear whether the district court reached the issue of causation in dismissing the case. One reading of the opinion would suggest that the district court felt that the element of causation was lacking in the appellant's proxy count. Another reading would indicate that the claim was dismissed because the only kind of injury which appellant claimed was economic injury based on the unfair merger ratio, and that the district court perceived this kind of injury to be a matter for the state courts, beyond the reach of the federal securities laws.

6. Under Indiana law minority stockholders are not entitled to the appraisal rights generally otherwise afforded, since here the company's shares are traded on the NYSE. Burns, Ind.Stat.Ann. Title 23, art. I, ch. 5, § 7 (1972). The rationale of this statutory exception may well be that appraisal rights are not necessary where the shares of dissenting shareholders can be readily sold at a fair market price. But here, if the appellant's allegations are true, the purpose of the appraisal statute was thwarted as the market price of Continental shares had been manipulated so as not to reflect their true value.

to be an unfair merger. While conceding this might well state a cause of action under state law, Judge Metzner rejected the argument that a federal claim could be maintained.[7]

The dismissal by the court below of appellant's 10b–5 count was based first upon what the district court said was a concession by the appellant that if his "basic claim under the proxy rules cannot be sustained, the 10b claim must also fall for want of the necessary causal connection" and secondly upon a determination that the count was defective because it contained "only conclusory allegations without any specific allegations of fraud or deception as required to support a 10(b) claim." Segal v. Gordon, 467 F.2d 602, 607 (2d Cir. 1972); O'Neill v. Maytag, 339 F.2d 764, 767–768 (2d Cir. 1964).[8] We disagree with the district court on its dismissal as to each of the federal act claims and hence reverse, for reasons stated below.

## I. THE RULE 10b–5 CLAIM.

■■■■ A. *The sufficiency of the complaint.* We go first to the 10b–5 count of the complaint. That count does allege generally "the engagement in a course of business which operated as a fraud and deceit on the purchasers and holders of Continental stock." If that were all that were alleged, it would fall within this court's rule that "mere conclusory allegations to the effect that defendant's conduct was fraudulent or in violation of Rule 10b–5 are insufficient." Segal v. Gordon, 467 F.2d at 607, *quoting* Shemtob v. Shearson, Hammill & Co., 448 F.2d 442, 444 (2d Cir. 1971), and O'Neill v. Maytag, *supra.* But here the complaint contains more than conclusory allegations. Paragraph 15 specifically alleges that Continental bank accounts were utilized by Penn-Dixie as compensating balances for Penn-Dixie's own borrowings and for Penn-Dixie's benefit without compensation or benefit to Continental, thereby depriving Continental of its ability to use its own capital to expand its business and thereby obtaining a more favorable merger exchange ratio. The same paragraph specifically alleges that Continental funds were utilized by Penn-Dixie to engage in a real estate venture in Florida with a "special customer" of Penn-Dixie, for the benefit of Penn-Dixie and without compensation to Continental for the use of its funds. The complaint alleges the charging of excessive intercompany costs to Continental, thus reducing Continental's income and increasing that of Penn-Dixie. It alleges an accounting change,

7. In so holding, the district judge indicated that he did not have to choose between the two competing lines of cases within this circuit on the question whether causation can be shown where the management controls enough votes to approve a transaction without the assent of the minority. This question was specifically left open by the Supreme Court in Mills v. Electric Auto-Lite Co., 396 U.S. 375, 385 n. 7, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). It has been answered affirmatively by some district courts, headed by Laurenzano v. Einbender, 264 F.Supp. 356 (E.D.N.Y.1966), and its progeny Heyman v. Heyman, 356 F.Supp. 958, 967–968 (S.D.N.Y.1973) and Weber v. Bartle, 272 F. Supp. 201 (S.D.N.Y.1967). Other district courts have, however, found causation lacking in such a factual setting. *See* Barnett v. Anaconda Co., 238 F.Supp. 766 (S.D.N.Y. 1965), and the cases following its line of reasoning: Hanover v. Zapata Corp., CCH Fed.Sec.L.Rep. ¶ 93,904 at 93,626 (S.D.N.Y. 1973); Weiss v. Sunasco, Inc., 295 F.Supp. 824 (S.D.N.Y.1969); Adair v. Schneider, 293 F.Supp. 393 (S.D.N.Y.1968); Robbins v. Banner Industries, Inc., 285 F.Supp. 758 (S. D.N.Y.1966); Hoover v. Allen, 241 F.Supp. 213 (S.D.N.Y.1965).

8. Segal v. Gordon, *supra*, rests on the language of Fed.R.Civ.P. 9(b) that "[i]n all averments of fraud . . . the circumstances constituting fraud . . . shall be stated with particularity." It is arguable, of course, that 9(b) relates only to common law fraud and in no way to SEC Rule 10b–5. The SEC Rule does refer to common law fraud in connection with the purchase or sale of a security in subsection 2, but it also illegalizes, in subsection 1, employing "any device, scheme, or artifice to defraud" and, in subsection 3, engaging "in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." *See* 3 A. Bromberg, Securities Law: Fraud § 11.8, at 264 (1973) (hereinafter Bromberg).

valuing certain Continental inventories on a last-in, first-out basis rather than average cost as had been done prior to 1971, thereby incurring a $595,000 special income charge reducing Continental's earnings for the year ending December 31, 1972, the year prior to merger. The complaint also alleges an over-inflation of Penn-Dixie assets by including in Penn-Dixie book value the sum of $21,425,000 which was the excess of cost over related net assets attributed to Penn-Dixie's purchase of the common stock of Continental.[9] Finally, it alleges that the appellees caused the Continental pension fund to purchase common stock of Penn-Dixie on the market in order to create a higher price for the shares of Penn-Dixie, which higher price was utilized to obtain an exchange ratio more favorable to Penn-Dixie. While all of these allegations are stated on information and belief, and there are cases holding that allegations of fraud based on information and belief usually do not satisfy the degree of particularity required by Fed.R.Civ.P. 9(b), Lee v. Alabama, 364 F.2d 945 (5th Cir. 1966); Duane v. Altenburg, 297 F.2d 515, 518 (7th Cir. 1962), the particularity requirement may be satisfied if, as here, the allegations are accompanied by a statement of the facts upon which the belief is founded. *Id.*; 5 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 1298, at 416 (1969). Wright and Miller point out that the rule relating to information and belief may be relaxed as to matters peculiarly within the opposing party's knowledge, as where the complaining stockholders in a derivative suit have little information about the manner in which the corporation's internal affairs are conducted and hence are rarely able to provide details as to the alleged fraud. *Id.* In any event, Rule 9 must be construed in conjunction with Rule 8, *id.*; Carroll v. First National Bank of Lincolnwood, 413 F.2d 353 (7th Cir. 1969), cert. denied, 396 U.S. 1003, 90

S.Ct. 552, 24 L.Ed.2d 494 (1970), and a complainant is not required to plead evidence. Brady v. Games, 76 U.S.App. D.C. 47, 128 F.2d 754, 755 (1942); Collins v. Rukin, 342 F.Supp. 1282, 1292 (D.Mass.1972). We consider Rule 9 sufficiently complied with here.

B. *The nature of the fraud.* It is well to put to rest, in the light of Judge Metzner's holding, a slow-to-die contention advanced by appellees principally in oral argument but to some extent in their brief—a contention first authoritatively set forth in Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir.), cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952), *viz.*, that § 10(b) "was directed solely at that type of misrepresentation or fraudulent practice usually associated with the sale or purchase of securities rather than at fraudulent mismanagement of corporate affairs. . . ." Here, appellees tell us, all that appellant is complaining about is "corporate mismanagement," and as such is in the wrong forum. As long ago as A. T. Brod & Co. v. Perlow, 375 F.2d 393, 397 (2d Cir. 1967), this *Birnbaum* proposition was no longer the law of this circuit as 10b-5 was there construed to include *"all* fraudulent schemes in connection with the purchase or sale of securities, whether . . . a garden type variety of fraud, or . . . a unique form of deception." While *Birnbaum* was principally relied upon in O'Neill v. Maytag, *supra,* which in turn was relied upon by the court below in terms of stating the restrictive view, the authority of these cases (*Birnbaum* and *O'Neill*) was, as stated by District Judge Moye in First American Corp. v. Foster, 51 F.R.D. 248, 251 (N.D.Ga.1970), "seriously undercut" by Schoenbaum v. First-brook, 405 F.2d 215 (2d Cir. 1968), rev'g, 405 F.2d 200, cert. denied, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969). Thus Judge Feinberg could write in Popkin v. Bishop, 464 F.2d 714, 718 (2d Cir. 1972), that "assertions by a defendant

---

9. The complaint alleges that if this $21,425,000 had been excluded, the actual book value of Penn-Dixie would have been approximately

$16 per share, rather than the $23.12 as stated in the proxy materials.

that the misconduct complained of 'really' amounts to 'just' corporate mismanagement will not cut off a plaintiff's federal remedy. Where Rule 10b–5 properly extends, it will be applied regardless of any cause of action that may exist under state law." In any event, any lingering doubts as to the vitality of this *Birnbaum* proposition were firmly interred by the Supreme Court in Superintendent of Insurance v. Bankers Life & Casualty Co., 404 U.S. 6, 10–11 n. 7, 92 S.Ct. 165, 168, 30 L.Ed.2d 128 (1971), when the Court stated that it is not "sound to dismiss a complaint merely because the alleged scheme does not involve the type of fraud that is 'usually associated with the sale or purchase of securities'" [*quoting* A. T. Brod & Co. v. Perlow, 375 F.2d at 397] and that

> [t]he fact that the fraud was perpetrated by an officer of [the company] and his outside collaborators is irrelevant to our problem . . .
>
> \*    \*    \*    \*    \*    \*
>
> We agree that Congress by § 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement. But we read § 10(b) to mean that Congress meant to bar deceptive devices and contrivances in the purchase or sale of securities whether conducted in the organized markets or face to face . . .

404 U.S. at 10–12, 92 S.Ct. at 168–169. It can thus truthfully be said as Professor Bromberg points out that "[a]fter *Supt. of Insurance*, then, *Birnbaum* survives significantly only for the buyer-seller requirement, which has been much reduced by other decisions."[10] 1 Bromberg § 4.7 (522), at 84.32.

We come then to the causation question, that is, whether the scheme which appellant alleges took place brought about the injury in fact. As we have said, it is difficult to tell whether Judge Metzner felt that this element of causation was lacking in view of his finding that the proxy violations in question—the misrepresentations and omissions of the appellees—did not cause a federally remediable injury to the appellant. Having thus disposed of the proxy count, Judge Metzner seemingly regarded the 10b–5 claim to be based on precisely the same operative facts, and for that reason dismissed it as well "for want of the necessary causal connection." We disagree with these conclusions.

■■ This is not a case where the 10b–5 claim is based solely upon material omissions or misstatements in the proxy materials. Were it so, concededly there would have to be a showing of both *loss causation*—that the misrepresentations or omissions caused the economic harm—and *transaction causation*—that the violations in question caused the appellant to engage in the transaction in question.[11] The former is demonstrated rather easily by proof of some form of economic damage, here the unfair exchange ratio, which arguably would have been fairer had the basis for valuation been disclosed. Transaction causation requires substantially more. In a misrepresentation case, to show transaction causation a plaintiff must demonstrate that he relied on the misrepresentations in question when he entered into the transaction which caused him harm. 2 Bromberg § 8.6, at 209–11. In an omission or nondisclosure case

---

10. To the extent that Segal v. Gordon, 467 F.2d 602 (2d Cir. 1972), and O'Neill v. Maytag, 339 F.2d 764 (2d Cir. 1964), rely upon *Birnbaum* for the enunciation of their specificity requirements, Superintendent of Insurance v. Bankers Life & Casualty Co., 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971), leaves them without applicability to the case at hand. *See also* Jannes v. Microwave Communication, Inc., 461 F.2d 525, 528–530 (7th Cir. 1972).

11. In terms of transaction causation, other methods of conceptualizing the same issue include the doctrines of reliance, materiality and the buyer-seller requirement. *See* 1 Bromberg § 4.7 (551), at 86; Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 495 F.2d 228, 238–240 (2d Cir. 1974). *See generally* Note, Causation and Liability in Private Actions for Proxy Violations, 80 Yale L.J. 107, 123–24 (1970).

based upon Rule 10b–5, a plaintiff need not show reliance in order to show transaction causation but must still show that the facts in question were material "in the sense that a reasonable investigator might have considered them important" in making his investment decisions. Affiliated Ute Citizens v. United States, 406 U.S. 128, 153–154, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972). *See* Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 495 F.2d 228, 240 (2d Cir. 1974).

Under the 10b–5 count, proof of transaction causation is unnecessary by virtue of the allegations as to the effectuation of a scheme to defraud which includes market manipulation and a merger on preferential terms, of which the proxy omissions and misrepresentations are only one aspect.[12] Thus appellant need only show loss causation with respect to his claim for relief under 10b–5; Judge Metzner found and we agree that this has been shown. Here the complaint clearly alleges that, as a result of the merger, appellant was forced to sell his Continental shares to Penn-Dixie on the basis of an exchange ratio that reflected adversely the manipulated market value of Continental stock, and that he sustained injury accordingly.

It is not seriously argued that there is a failure to state a claim for relief because there was no "connection" under Rule 10b–5 between the misconduct and the security transaction here involved. Nor could there be, particularly in view of the specific allegation that defendants caused the Continental pension fund to purchase the common stock of Penn-Dixie in the market in order to create a higher price for Penn-Dixie shares and thus obtain a more favorable exchange ratio. In any event, Superintendent of Insurance v. Bankers Life & Casualty Co., *supra*, and our own Drachman v. Harvey, 453 F.2d 736 (2d Cir. 1972) (en banc), rev'g, 453 F.2d 722 (2d Cir. 1971), make it clear that the viola-

tions here alleged had a connection with the sale of Continental shares and purchase of Penn-Dixie shares effectuated by the merger. *See also* Vine v. Beneficial Finance Co., 374 F.2d 627, 635 (2d Cir.), cert. denied, 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967).

Thus, the complaint completes the showing necessary to state a claim under Rule 10b–5. It alleges a specific scheme to defraud (a scheme which includes the proxy solicitation as a part, but which included substantial collateral conduct as well); the fraud was accomplished in connection with a securities transaction; the appellant was a seller in that transaction; and as a result of the sale, appellant alleges a loss was sustained.

II. THE 14a–9 CLAIM.

As to count two of the complaint based upon alleged proxy violations, as we have said, quite plainly appellant has alleged loss causation or economic loss in that there was an unequal, unfair and disadvantageous merger ratio, undisclosed in the proxy materials, by which he obtained fewer Penn-Dixie shares and warrants than he would have had the appellees' manipulative scheme been revealed. It is axiomatic that fewer shares are worth less on the open market than more shares, and while it is true that "damages should be recoverable only to the extent that they can be shown," Mills v. Electric Auto-Lite Co., 396 U.S. 375, 389, 90 S.Ct. 616, 624, 24 L.Ed.2d 593 (1970), the complaint alleges that appellant was the holder of 2,000 shares of Continental. Depending upon what the evidence shows in terms of damages, he might well have received in excess of the 3,000 shares of Penn-Dixie which he did in fact obtain had a fair exchange ratio been adopted. Therefore, we must immediately confront the issue whether the proxy violations themselves caused the transaction in question, the exchange.[13] Both types of causation

12. *See* 1 Bromberg § 4.7 (558–59), at 86.25, 86.32 (1973).

13. This is the question, as said, left undecided in Mills v. Electric Auto-Lite Co., 396

382

must be shown in order to state a Section 14(a) claim: transaction causation to show a violation of the law from which an appellant may recover, and loss causation to show damages.[14]

The premise underlying the strict view of transaction causation is that Penn-Dixie would have voted to proceed with the merger in any event, irrespective of any misstatements or omissions in the proxy. Even by dissenting to the merger minority stockholders of Continental could not have secured a higher price for their stock than the merger terms offered since under Indiana law, stockholders in a company listed on the NYSE have no appraisal rights. Burns, Ind. Stat.Ann. Title 23, art. I, ch. 5, § 7 (1972). The argument is in short that minority stockholders' votes must be viewed as meaningless since the insiders with a conflict of interest had enough votes to approve the transaction in any event.

This court has said, however, in affirming the second *Laurenzano* case, in which Judge Dooling found on the merits against the plaintiff that "[minority shareholder] approval was not meaningless; minority shareholder approval has value whether or not it is strictly essential to the power to act." Laurenzano v. Einbender, 448 F.2d 1, 5 (2d Cir. 1971). *See also* Lewis v. Bogin, 337 F. Supp. 331, 337 (S.D.N.Y.1972). As the Seventh Circuit said in Swanson v. American Consumer Industries, Inc., 415 F.2d 1326 (7th Cir. 1969) (*Swanson I*), "[t]he power to effect a given result certainly

does not negative all possibility of injury resulting from the fraudulent or manipulative use of that power." *Id.* at 1331–1332. While one need not go so far perhaps as Judge Sprecher, dissenting and concurring in Swanson v. American Consumer Industries, Inc., 475 F.2d 516, 522 (7th Cir. 1973) (*Swanson II*), by saying that causation should be conclusively established by the mere solicitation of votes, in a very real sense the shareholders were deceived by the action of those making the corporate decision to merge. *Cf.* Crane Co. v. Westinghouse Air Brake Co., 419 F.2d 787, 797 (2nd Cir. 1969), cert. denied, 400 U.S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50 (1970). *See also* Vine v. Beneficial Finance Co., 374 F.2d at 635.

We have previously said that a controlling shareholder's "ability to push through the merger—with or without any other shareholder's vote—cannot by itself defeat a claim for federal *injunctive* relief." Popkin v. Bishop, 464 F.2d at 718 (emphasis added) (but denying injunction since full disclosure was made). Again, as was recognized in Heyman v. Heyman, 356 F.Supp. 958, 967–968 (S.D.N.Y.1973), minority shareholders may "have recourse to measures other than the casting of proxies" to oppose those who have "the naked strength to consummate a fraudulent transaction." At least they are in a better position to protect their interests if they have full disclosure of the facts. *Cf.* Chris-Craft Industries, Inc. v. Piper Aircraft Corp., 480 F.2d 341, 375 (2d Cir.), cert. denied, 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d

U.S. at 385 n. 7, 90 S.Ct. at 622, "whether causation could be shown where the management controls a sufficient number of shares to approve the transaction without any votes from the minority." It is not insignificant to note that the Court went on to say,

Even in that situation, if the management finds it necessary for legal or practical reasons to solicit proxies from minority shareholders, at least one court has held that the proxy solicitation might be sufficiently related to the merger to satisfy the causation requirement.

*Id.* Without putting too much emphasis upon citations by the Supreme Court in footnotes, the Court then cited the first *Laurenzano* decision, Laurenzano v. Einbender, 264 F.Supp. 356, 360–362 (1965), and cited the strict view of causation taken in Barnett v. Anaconda Co., 238 F.Supp. 766, 771 (S.D.N.Y.1965), as a "*But see.*"

14. Mills v. Electric Auto-Lite Co., 396 U.S. at 377, 90 S.Ct. 616; J. I. Case Co. v. Borak, 377 U.S. 426, 431, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). *But see* Note, Private Actions for Proxy Violations, 80 Yale L.J. 107, 124 n. 80 (1970).

148 (1973); Gerstle v. Gamble-Skogmo, Inc., 478 F.2d 1281, 1302–1303 (2d Cir. 1973).

■ In the end we must remember the "broad remedial purposes" of the Securities Act. J. I. Case Co. v. Borak, 377 U.S. 426, 431, 84 S.Ct. 1555, 12 L. Ed.2d 423 (1964); SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 195, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963). Indeed, *Mills* itself, while leaving the question open, as we have pointed out, by holding that there was a sufficient causal relationship in a proxy case by proof that the proxy solicitation itself rather than the particular defect in the solicitation materials was an essential link in the accomplishment of the transaction, 396 U.S. at 385, 90 S.Ct. 616, lends some support to a more moderate view of transaction causation. Causality, we think, is sufficiently pleaded; the proof may, of course, be something else.

Causation is a concept stemming from the law of torts, but we are here talking about the statutory purpose of the proxy rules, a purpose which, as *Mills* itself pointed out, arises from Congressional belief in "fair corporate suffrage" to obtain which "explanation to the stockholder of the real nature of the questions for which authority to cast his vote is sought." Congressional concern was specifically with conflict of interest transactions. Stock Exchange Practices, S. Rep.No.1455, 73d Cong., 2d Sess., 74–76 (1934). *See also* S.Rep.No.792, 73d Cong., 2d Sess., 12 (1934). Indeed, the addition in 1964 of Securities Exchange Act § 14(c), 15 U.S.C. § 78n(c) (1970), which operates when shareholder action is taken but proxies are not solicited, applies to the very situation when typically no minority votes are needed. That section requires dissemination to shareholders of "information substantially equivalent to the information which would be required to be transmitted if a solicitation were made . . . ." *Id.* There has to be at least as strong a policy for accurate and complete information to the holder, such as the appellant here, whose vote is solicited but not needed. *See*

Bromberg § 4.7(556), at 86.23 (1973). As Judge Fulham wrote in Weiss v. Sunasco Inc., 316 F.Supp. 1197, 1205 (E.D. Pa.1970), a post-*Mills* decision, "As I understand *Mills*, the proper test is whether the proxy solicitation is 'an essential link in the accomplishment of the transaction' giving rise to the litigation, irrespective of the fact that other possibilities were available to management." The equities call for protection of the minority shareholder when he is the most helpless, as when neither disinterested director nor disinterested shareholder voting exists as a safeguard. To require strict causation would "sanction all manner of fraud and overreaching in the fortuitous circumstance that a controlling shareholder exists." Swanson v. American Consumer Industries, Inc., 415 F.2d at 1331.

■ It is true that appellant brought his action for damages before the merger when indeed he could have sued to enjoin. The argument is made that by failing to seek an injunction the appellant is precluded from recovery. We disagree. Appellant may well have felt that in the end an injunction would cost everyone more money and create greater problems for all. Or he might have been required to post a bond for damages and been unable to pay the premium.

The court below said that "the deficiency of the instant complaint stems from the absence of any allegation of injury which was caused by the proxy violations, *aside from that claimed to flow from the unequal ratio*" (emphasis added). Of course, there was injury flowing from the unequal ratio in terms of a lesser value of stock received by the minority Continental shareholders in the merger. Again, if it is reliance to which Judge Metzner was referring, the analogous 10b–5 cases of Superintendent of Insurance v. Bankers Life & Casualty Co., *supra*, and Affiliated Ute Citizens v. United States, *supra*, put this defense aside. To hold otherwise would make the proxy requirements a farce. *Affiliated Ute* holds that reliance is sat-

isfied by a material omission when there is a duty to disclose.

The minority shareholders, aside, there are two other purposes served by the disclosure requirements which make a strict causation rule—whether under a 10(b) or a 14(a) claim—antithetical to it:

1. By disclosure the *market* will be informed, so as to permit well-based decisions about buying, selling and holding the securities involved in the transaction. *See generally* SEC v. Texas Gulf Sulphur Co., 401 F.2d 833 (2d Cir. 1968) (en banc), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). Thus, had there been full disclosure here, the merger ratio would have been unfair on its face and the shares of Penn-Dixie in the open market would have sold for less.

2. By virtue of the disclosure either modification or reconsideration of the terms of the merger by those in control might be effectuated. We cannot assume that even a rapacious controlling management would necessarily want to hang its dirty linen out on the line and thereby expose itself to suit or Securities Commission or other action—in terms of reputation and future takeovers.[15] *See Swanson I*, 415 F.2d at 1332; Rosenblatt v. Northwest Airlines, Inc., 435 F.2d 1121, 1124 (2d Cir. 1970); Laurenzano v. Einbender, 264 F.Supp. at 361.

In short, we refuse to adopt the narrow view of causation for which the appellees argue. Instead in the light of the *Mills* footnote, *Affiliated Ute, supra,* the Seventh Circuit's *Swanson I* and *Swanson II*, and the other cases in our own circuit above referred to, we are of the view that sufficient causation is alleged so that the complaint must not be dismissed. None of what we say, of course, goes to the merits of the case; that must await trial on the facts.

Judgment dismissing the complaint is hereby reversed and remanded.

FRANKEL, District Judge (concurring):

I concur in the result and in most of the court's opinion. With all deference, however, I am unable to join completely in the opinion because of those portions which employ the concepts of "loss causation" and "transaction causation." While these terms have had some scholarly currency, as the majority shows, and while they may prove eventually to be useful, I am not convinced at this time that the Circuit ought to be committed to their employment or to their still uncertain implications.

The appeal before us arises on a bare pleading. The terminological questions explored by the majority have not been briefed or argued. It does not appear that the issues as the parties presented them require such exploration.

I am not prepared to find these labels either useful or harmful. I conclude only that, being unnecessary, they ought not to enter into an opinion on the limited questions before the court.

15. In this regard it might well be observed that since the merger ratio here was based upon such factors as market price and recent earnings (Joint Proxy Statement at 3) and since it is alleged that those prices and earnings were manipulated by the appellees, the omissions in the proxy statement stand as a definite causal link in the transaction in question. But for the omissions and misstatements, the merger terms may have been so obviously unfair that the appellees would not have attempted the transaction on those terms.