Henry J. MORGAN, Plaintiff,

v.

PRUDENTIAL FUNDS, INC., Prudential Ventures Corp., Nathan M. Shippee, John T. Becker, Mortimer M. Caplin, Richard N. Funkhouser, Frederick M. Glass, Charles J. Kushell, Jr., Adolph Magidson, Winston S. McAdoo, E. J. Willey, Meridian Oil Corporation, UV Industries, Inc., Dorchester Exploration, Inc., Dallas Production, Inc., Southern Energy Corporation, Shenandoah Oil Corporation, Bank of Montreal, National Bank of Commerce of San Antonio, First National Bank of Midland, Texas, Midland National Bank, Republic National Bank of Dallas, Theodore C. Bartling, Bartling & Associates, Inc., Foreman, Dyess, Prewitt, Rosenberg & Henderson, Price Waterhouse & Co., Palmer, Serles & Baar, Abrams & Sassower, and Caplin & Drysdale, Defendants.

No. 75 Civ. 5245.

United States District Court, S. D. New York.

Feb. 28, 1978.

Sidney Silverman of Silverman & Harnes, New York City, for plaintiff.

Michael W. Lillie of Shearman & Sterling, New York City, for defendants Bank of Montreal and Shenandoah Oil Corp.

Robert E. Meshel and Jonathan M. Plasse D'Amato, Costello & Shea, New York City, for defendants Palmer, Serles & Baar and Abrams & Sassower.

Peter Fleming, Jr., Robert D. Piliero and Lee S. Richards of Curtis Mallet-Provost, Colt & Mosle, New York City, for defendant Price Waterhouse & Co.

J. Jerome Olitt of Olitt & Friedberg, New York City, for defendants Prudential Funds, Inc., Prudential Ventures Corp., Nathan M. Shippee, John T. Becker, Richard N. Funkhouser, Frederick M. Glass, Charles J. Kushell, Jr., Adolph Magidson and Winston S. McAdoo.

John A. K. Bradley, New York City, for defendants E. J. Willey and Meridian Oil Corp.

Samuel M. Eisenstat of Eisenstat & Gottesman, P. C., New York City, for defendants Theodore C. Bartling and Bartling and Associates.

Adlai S. Hardin, Jr. and Samuel H. Gillespie III of Milbank, Tweed, Hadley & McCloy, New York City, for defendants Mortimer M. Caplin and Caplin & Drysdale.

David R. Hyde and Charles S. Leeper of Cahill, Gordon & Reindel, New York City, for defendants Dallas Production, Inc. and Southern Energy Corp.

Lawrence Kill, Steven M. Pesner and Andrew P. Brozman of Anderson, Russell, Kill & Olick, New York City, for defendant Dorchester Exploration Inc.

Charles J. Acker and Daniel M. Goldfarb of Hart & Hume, New York City, for defendant Foreman, Dyess, Prewitt, Rosenberg & Henderson.

LASKER, District Judge.

Henry Morgan's "amended and supplemental" complaint alleges violations of Sections 10(b) and 14(e) [1] of the Securities and Exchange Act of 1934 (15 U.S.C. §§ 78j(b) and 78n(e)) and Securities and Exchange

---

1. The fourth and final claim in the complaint does not, as it purports to, allege fraud in connection with a tender offer, actionable under Section 14(e) of the 1934 Act (15 U.S.C. § 78n(e)). On the face of the complaint, it is clear that the accused tender offer was never consummated (¶ 51, Complaint). The injury pleaded in the fourth claim arose from an allegedly improper liquidation of assets that oc-

curred after the tender offer was revoked. In sum, it is conceded that there is no causal connection between the aborted tender offer and the alleged injury. *See, TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 444, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976); *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 383–85, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970).

Commission Rule 10b–5 (17 C.F.R. § 240.-10b–5). Several of the defendants[2] move to dismiss the complaint on the grounds that, as to them, it fails to state a claim upon which relief can be granted.[3] Rule 12(b)(6), Federal Rules of Civil Procedure. For the reasons stated below, the motions are granted, and on our own motion, the complaint is dismissed.

In May, 1972, Morgan invested $30,000. in an oil and gas exploration fund and thereby became a limited partner in the Plaza One Development Fund, which was one of a number of programs collectively referred to as the 1972 Programs.[4] Participation in the 1972 Programs was offered to the public by Prudential Ventures Corporation ("Ventures"), a wholly owned subsidiary of Prudential Funds, Inc. ("Prudential").[5] What Ventures was offering was claimed to be an attractive tax shelter opportunity; its features were described in a variety of "selling documents": registration statements, prospectuses and other pieces of sales literature. Although the selling documents are not specifically identified, Morgan alleges that he bought his share on the strength of a prospectus entitled "Units of Limited Partnership Interests in Resource Ventures Development Fund." This is the only publication that he alleges having seen in connection with his purchase.

The uniqueness of the 1972 Programs lay in their financial structure, two features of which assured tax treatment of a sort not to be found in competing tax shelter programs based on oil and gas ventures. First, the selling documents proclaimed that the actual drilling and explorations would be financed by non-recourse loans and that the loans would be secured by oil and gas reserves that had been *proven and developed*.

Use of proven reserves as collateral ("back end leveraging") permitted each investor to incorporate the loans into his or her cost basis. The stepped up cost basis would have been unavailable if the 1972 Programs had collateralized the loans with unproven, undeveloped oil and gas reserves ("front end leveraging"). Front end leveraging was mentioned and criticized in the Prudential selling documents. Second, the 1972 Programs were committed to use the borrowed funds to prepay "intangible drilling and development expenses." The irrevocable allocation of borrowed funds to those specific expenses allowed investors to claim deductions in the year of prepayment, rather than in the year that the expenses actually materialized.

*Phase I of the Fraud—The First Claim for Relief*

After all the partnership interests had been sold, the mechanics of the 1972 Programs were set in motion. This occurred in the fall of 1972, after Morgan had purchased his interest. The first step in the actualization of the exploration/development program was the drafting of a model contract. The contract, which was to govern the relations between Prudential and whatever drilling companies were to be hired to perform the actual field work, contained, among other items, the terms of loan agreements and the details concerning use of borrowed funds. When, in October, 1972, it came time to draft the model contract, the Prudential Defendants had not established proven oil and gas reserves sufficient for the back end leveraging that had been described in the selling documents. The October developments were, according to the complaint, the first sign that the anticipated financial structure would be un-

---

2. The moving defendants are Meridian Oil Corporation (Meridian), Dorchester Exploration, Inc. (Dorchester), Dallas Production, Inc. (Dallas), Southern Energy Corporation (Southern), Shenandoah Oil Corporation (Shenandoah), Bank of Montreal, Theodore C. Bartling (Bartling), Bartling & Associates, Inc. (Bartling & Associates), Foreman, Dyess, Prewitt, Rosenberg & Henderson (Foreman, Dyess), Price Waterhouse & Co. (Price Waterhouse), Palmer, Serles & Baar (Palmer, Serles), Abrams & Sassower, Caplin & Drysdale, and Mortimer M. Caplin (Caplin).

3. Our disposition makes it unnecessary to decide the alternative motions, which are made pursuant to Rules 9(b) and 56(b).

4. The history of Morgan's investment is distilled from the complaint. On the motions to dismiss, the allegations of the complaint are taken as true.

5. Ventures, Prudential, and the officers and directors of Prudential are collectively referred to as the "Prudential Defendants."

available. There is no allegation that at the time the selling documents were circulated, the Prudential Defendants knew or recklessly failed to discover that they would lack the reserves required for the promised form of financing.[6] The model contract that was drafted, with the assistance of defendants Bartling and Foreman & Dyess, contained provisions calling for *front* end leveraging, the very method that had been disparaged by the selling documents. In November, Prudential circulated the draft model contract to Caplin & Drysdale and Palmer, Serles. These law firms advised Prudential that the scheme contemplated by the model contracts as drafted did not conform to what had been described in the selling documents. Prudential was warned that the Caplin & Drysdale tax opinion letters, which had been the basis of the tax information contained in the prospectus, did not cover the system laid out in the model contract. Prudential was further alerted that implementation of the draft contract might, in light of the representations made in the selling documents, create securities laws problems.

Reform was urged. In late November, responding to the criticism of the law firms, Prudential agreed to change the model contract and bring it into conformity with the selling documents. Prudential's acquiescence was a sham, for at the time it agreed to make the changes in the model contract, it intended to employ front end leveraging, no matter what the terms of the revised contract might indicate. This is the first allegation of fraud (¶ 15, Complaint).

A revised contract appeared in early December. It called for a three phase drilling program, in which reserves developed in the first phase would be used to collateralize loans needed to finance the subsequent phases. The December contract had the potential of fulfilling the descriptions contained in the selling documents. However, by mid-December, "none of the prospects [explored in the first phase of drilling] had been developed sufficiently to provide collateral for loans to finance subsequent drilling phases." With the year nearly over, the promise of back end leveraging disappeared. In the final days of December, 1972, the Prudential Defendants, "aided and abetted by defendants Bartling and Bartling & Associates," concocted an elaborate scheme to conceal their failure to live up. to their earlier promises. There is no need for detailed description of the scheme. In short, a series of complicated loan transactions, involving Prudential, Bartling, the Operator defendants, and the Bank defendants, was consummated. The important feature of these transactions was that they deviated from what had been contemplated by the selling documents. The transactions were *not* "nonrecourse loans collateralized by established reserves and committed to intangible oil and drilling expenses," they were "bogus transactions," in which Prudential borrowed from the Banks, delivered the proceeds to the Operator defendants and then had the Operator defendants purchase certificates of deposits from the

---

**6.** The complaint alleges, in Paragraph 8, that the statements contained in the selling documents as to the projected financial structure were false and misleading because:

"(a) Loans were not obtained from independent lenders, and were not secured by producing properties developed by funds already committed to the 1972 Programs. In many instances, the Operator Defendants, defendant Willey, and the Bank Defendants participated with the Prudential Defendants in bogus loan transactions in which checks were exchanged and certificates of deposit purchased with the 'borrowed' funds and used to secure the loans. Such loans served no economic purpose but were used solely to create a fictitious increase in the cost basis for tax purposes of the members of the Class.

The Operator Defendants and the Bank Defendants profited as a result of such bogus loans and transactions and knew or should have known that such loans and transactions were part of a plan and scheme to defraud the Class.

(b) Similarly, the Operator Defendants were not bound to use the funds denominated as prepaid intangible drilling and development expenses for such purposes, but rather used such payments to secure the bogus loans. Since the Operator Defendants were not irrevocably bound to proceed with drilling and development activities with the prepaid expenses, the Class was not entitled to deductions for such activities in the year such payments were made."

Banks. It is claimed that the "Bank Defendants, the Operator Defendants, the Prudential Defendants, defendants Willey, Bartling and Bartling & Associates knew or should have known that the bogus loan transactions were part of a plan and scheme to defraud the class" (¶ 23, Complaint).

*Phase II of the Fraud—The Second Claim for Relief*

Following the "bogus" transactions, a number of individual and corporate defendants are alleged to have "engaged in a conspiracy to conceal, cover up the fraudulent activities engaged in by the Prudential defendants, thereby aiding and abetting the continuation of such activities." (¶ 43, Complaint) The gist of the conspiracy is that the aider-abettor defendants discovered a variety of material details; their failure to disclose rendered them culpable.

\* \* \* \* \* \*

For all but the Prudential Defendants, liability for the federal violations, alleged in the first and second claims for relief,[7] is based on a theory of aiding and abetting. This theoretical groundwork is explicit in the complaint (¶¶ 21, 25, 43) as well as in Morgan's legal memoranda in opposition to defendants' motions to dismiss. In particular the first claim alleges aid in the form of "bogus transactions." The second claim for relief alleges aid in the form of a cover-up that started in early 1973 and continued through the fall of that year. The principal, underlying fraud to which the bogus transactions and cover-up are said to be connected is the misrepresentation (through the use of false and misleading selling documents) that was perpetrated by the Prudential Defendants prior to Morgan's May, 1972 purchase.

■ An aider or abettor may be held liable under Rule 10b–5, *Rolf v. Blyth, Eastman Dillon & Co., Inc.,* 570 F.2d 38 at 44 (2d Cir. 1978) and cases cited therein.

However, violation of the securities laws by the primary party (here, the Prudential Defendants) is of course a prerequisite to the liability of an alleged aider or abettor. *Rolf v. Blyth, Eastman Dillon & Co., supra,* at 47, and cases cited; *Rosen v. Dick* [1974–75], C.C.H.Fed.Sec.L.Rep. ¶ 94,786 at 96,604 (S.D.N.Y.1974); *In re Equity Funding Corporation of America Litigation,* 416 F.Supp. 161, 179, 180 (C.D.Cal.1976). Morgan's "amended and supplemental" complaint does not contain an allegation of primary fraud. Although it alleges that the representations in the selling documents ultimately proved to be false (the promised back end leveraging never materialized), it is not claimed that the Prudential Defendants knew or recklessly failed to discover that their promises were false at the time they made them. The absence of a scienter allegation destroys the claim of principal fraud, *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), and so, undermines a basis for the imposition of secondary, aiding-abetting liability.

The failure properly to allege scienter in the allegation of primary fraud compels dismissal of the complaint.[8] However, further discussion of the potential liability of the claimed post-purchase aider/abettors is appropriate in light of the fact that, as is apparent both from his legal memoranda and from the presentation made at oral argument of the motion, Morgan *intended* to allege primary fraud.

■ At oral argument, counsel for plaintiff indicated that what we now hold to be the defective allegations concerning the Prudential Defendants were meant to be a claim for fraudulent misrepresentation. The pleading that was intended would contain this claim: that the Prudential Defendants promised the future use of back end leveraging when, at the time the promise was made, they knew that it was impos-

---

7. As indicated above, *supra,* at n. 1, to the extent that the fourth claim does properly state a claim, it does so under state, not federal, law. The third claim is also based on state, not

federal, law (see, ¶¶ 44–46, October 22, 1976 Memorandum at 29).

8. With the federal claims gone, there is nothing to which the state claims may be pendent.

sible to obtain such leveraging. Although such allegations would state a claim on Prudential's behalf, they would preclude the sort of secondary liability that plaintiff wishes to impose. If the Prudential Defendants promised the impossible and Morgan bought on the strength of that promise, both the fraud and the injury were consummated at the moment of purchase, May, 1972, and the later complicity by strangers to the original misrepresentation is not actionable under federal law. Plaintiff's ultimate loss was ordained at the moment the purchase transaction was completed, for at that moment, the objective impossibility of ever achieving back end leveraging guaranteed that Morgan's tax saving was doomed. Whatever the "aiders-abettors" did in December, 1972, their activities had absolutely no effect on Morgan's injury. In sum, under the proposed allegation of primary fraud, it will be impossible to show a causal relationship between the claimed, post-purchase complicity and the harm that Morgan suffered. Without such a relationship, no liability may attach under 10b–5. See, *Titan Group, Inc. v. Faggen*, 513 F.2d 234, 239 (2d Cir. 1975) (and cases cited therein); *Schlick v. Penn-Dixie Cement Corporation*, 507 F.2d 374, 380–81 (2d Cir. 1974) *cert. denied*, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975); *Crane Company v. Westinghouse Air Brake Company*, 419 F.2d 787, 797 (2d Cir. 1969), *cert. denied*, 400 U.S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50 (1970).

Yet another allegation of primary fraud, different from the one advanced at argument, is offered in plaintiff's principal memorandum of law in opposition to the motions to dismiss (at 12). There Morgan asserts that the Prudential Defendants contrived a "scheme to defraud which included the making of representations which the defendants never intended to fulfill and the actual failure to fulfill them." Although we express no opinion whether this allegation, if formally pleaded, would state a claim against the Prudential Defendants which in turn could act as a predicate for aiding and abetting liability, it is difficult to conceive the events of December, 1972 and those that followed as "in connection with" Morgan's purchase in May, 1972. *See, e. g., Halperin v. Edwards and Hanly*, 430 F.Supp. 121 (E.D.N.Y.1977); *In Re Equity Funding of America Securities Litigation*, 416 F.Supp. 161, 171, 179–81 (C.D.Cal. 1976); *Kogan v. National Bank of North America*, 402 F.Supp. 359 (E.D.N.Y.1975).

The complaint is dismissed without prejudice to filing an amended complaint within sixty days of the filing of this order.

In view of the dismissal of the complaint, plaintiff's motion for class action certification is denied as moot.[9]

It is so ordered.

---

**9.** In the event that an amended complaint is filed hereafter, the motion for class action certification may be renewed on the papers already filed.