**PIERRE J. LeLANDAIS & CO., INC., et al., Plaintiffs,**

**v.**

**MDS–ATRON, INC., et al., Defendants.**

**No. 72 Civ. 2278–CLB.**

United States District Court,
S. D. New York.

Dec. 27, 1974.

Butowsky, Schwenke & Devine, New York City, for plaintiffs.

Beekman & Bogue, New York City, for defendants.

## FINDINGS AND CONCLUSIONS

BRIEANT, District Judge.

This action was initiated May 25, 1972 and tried before me without a jury commencing on February 11, 1974. The post-trial briefs and memoranda of the parties have been considered.

By their amended complaint filed June 1, 1973, plaintiffs assert numerous and variously stated claims against some or all of the defendants. The Court has subject matter jurisdiction of those claims pleaded under the federal securities laws, and pendent jurisdiction of common law claims pleaded, as well as personal jurisdiction over all of the parties except for defendant Joseph S. Stoutenburgh, upon whom personal service of the summons and complaint was never effected.[1]

Plaintiffs seek to recover damages by reason of claimed breach of §§ 14(a) and 10(b) of the Securities Exchange Act of 1934; Rules 14a–9 and 10b–5, arising out of the corporate merger hereinafter described. While eight (8) separate counts or causes of action are pleaded, it is unnecessary to summarize or list them.

A detailed pre-trial order was filed January 3, 1974. The stipulations and concessions of fact contained therein are incorporated herein by reference without specific restatement.

*The Parties.*

Plaintiffs are purchasers or successors in interest of purchasers of common stock of Atron Corporation ("Atron"), incorporated in Minnesota on November 27, 1968. Pierre J. LeLandais & Co.,

---

1. Stoutenburgh was at all times available, and testified at the trial. This omission to serve process was called specifically to the attention of plaintiffs by Stoutenburgh's verified answer. That he was not served seems to have no practical bearing on the issues in this litigation, or the rights of the plaintiffs.

Inc., for purposes of this litigation, may be treated as the *alter ego* of Pierre J. LeLandais, whose Atron stock it acquired as beneficial owner. See Pre-Trial Order, ¶ 10. Intercontinental Technology & National Resources, S.A. (hereinafter "ITNR"), a Luxembourg corporation, became on or about November 18, 1969, the beneficial owner of Atron stock, originally purchased by plaintiff Research and Science Investors, Inc. ("RSI").

RSI is a Maryland corporation which refers to itself as a venture capital fund. ITNR is an investment fund. Plaintiff Coronet Fund ("Coronet") is a partnership in which Rudi E. Ludt is general partner. It is a venture capital fund. Ludt is by occupation a professional money manager. Creative Capital Fund ("Creative") is likewise a partnership operated as a venture capital fund in which Erwin LePow is general partner. LePow's prior professional experience is that of senior vice-president of a company listed on the American Stock Exchange. Mr. LeLandais' professional experience has been that of an investment banker and stock broker.

Plaintiffs may be classified as experienced and knowledgeable investors of the sort to whom the relatively meaningless description "sophisticated" is so often applied. Indeed, defendants claim, with some justification, that their adversaries are "super-sophisticated."

Defendant Mohawk Data Sciences Corp. ("Mohawk") is a publicly owned New York corporation whose common stock is and was at all relevant times registered and publicly traded on the New York Stock Exchange. It is and was engaged in the design, development, manufacture and sale, or disposition by rental arrangements having many characteristics of a sale, of electronic data processing equipment to be used by the ultimate computer customer. Defendant Richard L. Karpen was from January 1st to April 30, 1971 an officer and director of Mohawk, and a director of Atron. Defendant Joseph S. Stoutenburgh was President and a Director of

Atron from its inception until April 30, 1971. Thereafter, until the date of trial, he was employed by a wholly owned subsidiary of Mohawk.

MDS–Atron, Inc. is a Delaware corporation wholly owned by Mohawk. It was formed as a corporate vehicle to effect a statutory merger of Atron whereby shareholders of Atron would acquire common stock of Mohawk, and Mohawk through its sole ownership of MDS–Atron stock would become in effect the owner of the business and assets of Atron. Atron merged with MDS–Atron, Inc., and in practical effect merged with Mohawk on April 30, 1971.

*Factual Background.*

A group of persons having special talents in the electronic data processing field, most of whom had previously been employed by Sperry-Rand, and participated thereby in the early development of "Univac", formed Atron in 1968 for the purpose of designing, developing and manufacturing computer equipment or components to be sold to original equipment manufacturers. At all relevant times, Mohawk was Atron's principal customer, to the extent of approximately 90% of sales, and in addition, Mohawk was a supplier of peripheral devices such as line printers and cardreaders to Atron for inclusion as components of Atron's systems.

In early 1971, Mohawk owned 195,000 shares of Atron common stock, and the Mohawk Pension Trust owned 16,000 shares, making a total of 211,000 shares out of 1,090,110 shares outstanding. Mohawk acquired some of its shares as original issue, and purchased the balance in January, 1969. All Mohawk's shares of Atron were purchased without registration under the Securities Act of 1933. All were subject to transfer restrictions, pursuant to a so-called investment letter, or otherwise, which prevented sale thereof by Mohawk without registration.

Mohawk, after January, 1971, had the contract right to terminate its purchases of Atron's principal product, and manufacture the product itself. Atron, in

brief, was a single customer company, faced with the realistic possibility of losing that customer. It was operating at a substantial loss ($1,298,945.00 for its fiscal year ending September 30, 1970, and continuing during the months immediately prior to April 30, 1971), but it possessed $3,000,000.00 in uninvested cash or cash equivalent.

Most, if not all, of plaintiffs, had acquired their shares directly or indirectly as a result of the efforts of LeLandais, or securities firms with which he had been associated. In December, 1968, Mohawk, together with other principals of Atron, purchased its first stock issue. In the course of these sales to so-called "founders", SCI Capital, Inc., a wholly owned subsidiary of LeLandais' then employer Stralem & Co., investment bankers, bought 3,750 shares.[2] Later, of this stock, 1,668 shares were issued to LeLandais. Each of these shares were restricted as to transfer, and bore the customary legend on the certificates to that effect. In January, 1969, Mohawk purchased 187,500 additional shares. A private placement was effected that same month, in part through the efforts of LeLandais, and it was at that time that plaintiffs Coronet, Creative, Le-Landais & Co. and RSI also acquired various holdings of Atron shares, all as detailed in the pre-trial order.

A second private placement took place in September, 1969, effected by Hamershlag, Borg & Co., an investment banking firm which then included Le-Landais among its members. In January, 1970 Ladenburg Thalman & Co. sold 300,000 shares to the public pursuant to a registration statement. These shares were sold in units of one warrant and two shares.

All shareholders of Atron, except those who purchased through the Ladenburg offering, had purchased unregistered shares pursuant to so-called investment letters, given according to the custom and practice in the financial community. The Court finds that the purchaser plaintiffs had actual knowledge of the terms and conditions of their respective subscription agreements and the letters given in usual form, representing their investment intent. These plaintiffs specifically agreed with Atron that the shares to be received by them were to be restricted as to transferability and that the certificates representing these shares would carry a restrictive legend. Each purchaser represented that he or it was purchasing the Atron shares for investment purposes only, and not with a view to distribution, and agreed that the shares would not be sold unless registered with the Securities and Exchange Commission, or following receipt of an opinion from Atron's counsel that the shares could be sold without registration.

Each of these plaintiffs, sophisticated and experienced investors, had participated in similar purchases of investment letter stock in the past, and knew the nature, extent and legal effect of their express representations and agreements with Atron placing limitations upon resale of the Atron private placement shares they purchased.[3]

---

2. Atron stock was the subject of a reverse stock split, one for two shares in July 1969. Unless otherwise stated, all references are to the new shares.

3. Representative of the limitations is the legend on Atron stock certificate No. S–00026 issued to plaintiff Coronet Fund on November 24, 1969 (Exhibit No. 10), which reads as follows:

"The shares represented by this certificate have been purchased under investment presentations and no transfer or other disposition may be made except in compliance with the requirements of the Securities Act of 1933."

By undated letter physically attached to a Stock Purchase Agreement made as of January 16, 1969, Coronet, by the signature of R. E. Ludt, agreed with Atron as follows:

"The Purchaser hereby represents, warrants and confirms that Purchaser is acquiring the Stock for investment for Purchaser's own account and not with a view to, or for sale in connection with, any distribution of such Stock, and the Purchaser has no present intention of distributing or selling such Stock. The Pur-

We must exclude plaintiff ITNR from any of the foregoing generalizations. The shares which ITNR claims to own were purchased in a block of 5,000 in connection with the September, 1969 private placement through Hamershlag, Borg & Co. These certificates were originally issued to plaintiff RSI as investment letter shares, and RSI executed the subscription agreement, which included representations of an intent to hold as an investment. These shares were "sold" to ITNR on November 18, 1969. All that ITNR acquired at that time, or held at any relevant time, was equitable ownership. No letter of investment intent was given by ITNR to Atron or to RSI. On December 9, 1969, at the request of RSI, record ownership of this stock was placed in the name of Boyd & Co., a nominee of the Schroder Trust Company in New York. Payment to Atron was made by RSI at the time of issue of the shares, when ITNR had no funds.

On or shortly after September 17, 1969, Stoutenburgh, then President of Atron, received a letter (Exhibit 32) from the attorney for RSI who advised that his client

"expects that it will transfer these shares to a new foreign investment company to which RSI expects to act as Investment Counselor. I understand that John French has discussed this matter with you, and I have discussed it with David Finkelman of Stroock & Stroock & Lavan. The transferee would take the shares, of course, subject to the rights and obligations of an Investor as stated in the Stock Purchase Agreement. Will you please have an officer of Atron execute the duplicate of this letter enclosed herewith to indicate that Atron agrees to this arrangement.

The name of the foreign investment company is Intercontinental Technology & Natural Resources S.A. Its custodian in the United States is Schröder Trust Company, which usually requests that securities carried by it be registered in the name of its nominee, Boyd & Co."

Stoutenburgh, acting for Atron, endorsed a carbon copy of the above letter "receipt acknowledged". The Court interprets this acknowledgement of receipt to indicate agreement or acquiescence in the transaction by Atron, but finds no particular legal significance therein.

■ On December 9, 1969 Boyd & Co., as nominee of Schroder Trust Company, did become the holder of record of ITNR's shares. With respect to proxy solicitation material a corporation is entitled to deal in all respects with its shareholders of record. See Vol. II, Loss, Securities Regulation, p. 876, and Vol. 5, Fletcher Cyclopedia Corporations, §§ 2007, 2053. If further authority be required for this simple proposition, see 17 CFR 240.14a–3(12)d, which became effective December 20, 1974. Adoption of this regulation by the Commission is some evidence that no such practice was required in 1971.[4]

chaser acknowledges that the Stock is being issued and delivered without registration under the Securities Act of 1933 in reliance upon Purchaser's representation, as aforesaid. Purchaser hereby agrees that Purchaser will not resell or effect any other disposition of the Stock unless the Stock is duly registered under the Securities Act of 1933 or, in the opinion of counsel for the Company, such sale or disposition is exempted from such registration." [Exhibit 9]

4. This regulation, which is not retrospective, reads as follows:
"(d) If the issuer knows that securities of any class entitled to vote at a meeting with respect to which the issuer intends to solicit proxies, consents or authorization are held of record by a broker, dealer, bank or voting trustee, or their nominees, the issuer shall inquire of such record holder whether other persons are the beneficial owners of such securities and, if so, the number of copies of the proxy and other soliciting material and, in the case of an annual meeting at which directors are to be elected, the number of copies of the annual report to security holders, necessary to supply such material to such beneficial owners. The issuer shall supply such record holder with additional copies in such quantities, assembled in such form and at such a place, as the record

In 1971, a corporation such as Atron was not required to concern itself with whether nominees acting for offshore equitable owners of stock discharged their duties adequately, or communicated properly or sufficiently with their principals. When the owner of stock elected not to become the holder of record, but to place legal title in a nominee or custodian, or, as here, the nominee of a custodian, he accepted the risks consequent thereon. As will be seen below, ITNR at a critical point, "failed to get the word" from Atron or Mohawk, and was damaged as a result.

*The Merger Proposal.*

But, we are ahead of our story. We turn back to January 29, 1971, when, at Mohawk's invitation, Atron management met with officers of Mohawk, and agreed, subject to the approval of Atron's shareholders, that a merger would be proposed.

The Court finds nothing inappropriate about this suggestion, or its timing, or the way in which it was presented. There were good business reasons for the merger, both from the point of view of Mohawk and from Atron's position. Mohawk had the opportunity as a result of the merger to turn its restricted shares in Atron, a corporation undergoing a substantial monthly operating loss, into assets which had a net book value of approximately $4,300,000.00, of which $3,000,000.00 consisted of cash equivalents. Mohawk, together with its pension trust, owned approximately 19% of Atron.

Generally accepted principles of corporate democracy, which need not be amplified here, permit the shareholders to propose and vote upon a merger transaction, and grant to dissident minorities the right of appraisal. The Court finds no significance in the facts, taken separately or together, that the subject of a

merger was tendered to Atron by surprise, two days following Atron's annual meeting of shareholders which had been attended by Mohawk; that the subject was raised with no prior notice; that the Atron officers agreed forthwith, and set the exchange ratio of one share of Mohawk for four shares of Atron, that Ladenburg Thalman & Co., then considering itself Atron's investment banker, objected strenuously to the merger at first; that the final terms were agreed upon in the first and only discussion; and that neither Atron nor Mohawk made any independent study or appraisal of the proposed merger; or that Atron made no attempt to seek out other more favorable merger partners.

As previously noted there were good business reasons for the merger. The parties had a right to merge. Even if it be concluded that the management of Atron acted hastily, this, under the entire circumstances of the case, was not inappropriate, and as noted, those who are aggrieved may vote against the proposed merger and exercise the appraisal rights granted to them by the statutes of Minnesota and most states, to receive the value of their shares in cash.

The agreement in principle to merge was made public immediately on January 29, 1971, by means of a press release. The record date for determination of Atron shareholders entitled to vote was fixed at March 26, 1971. The proxy solicitation material was mailed on April 16, 1971, for the meeting to be held at Bloomington, Minnesota on April 30, 1971.

At the time the exchange ratio was fixed, Mohawk was selling at slightly more than four times the price of Atron. The relative market prices of the two stocks was the principal factor relied upon by the directors of Atron and Mohawk in fixing the exchange ratio. Their decision was not unreasonable.

holder may reasonably request in order to address and send one copy of each to each beneficial owner of securities so held and shall, upon the request of such record holder,

pay its reasonable expenses for completing the mailing of such material to security holders to whom the material is sent."

Atron faced difficulties, including an operating loss, and the possibility that its sole customer, Mohawk might, as it was permitted to do, seek a different resource, or manufacture the components itself. The market value of the Mohawk stock to be received was twice Atron's book value, two-thirds of which consisted of cash.

The Ladenburg firm expressed initial dissatisfaction with the exchange ratio of four shares of Atron for one of Mohawk. At a meeting held March 18, 1971, Mohawk's executive vice-president, Rifenburgh, convinced Ladenburg that the merger was prudent, and indeed necessary. Ladenburg indicated then that it would support the merger and urge its clients to do likewise. Following that date, Stoutenburgh expected to receive the favorable votes of those shares owned beneficially or of record by Ladenburg, and also the votes of any public shareholders who would rely upon or seek the opinion of Ladenburg.

On February 5, 1971, LeLandais, then affiliated with Merkin & Company, a stock brokerage house, mailed a letter and research report (Exhibit 27) to a number of Atron shareholders with whom he or his former firms had prior business relationships. The letter treats the projected merger as a *fait accompli.* The report neither favored nor opposed the merger, but expressed a view that Mohawk's future prospects did not justify its present high price earnings multiple, and that holders of Atron shares should consider the advisability of making sales, prior to the merger and exchange.

On February 17, 1971, Stoutenburgh, President of Atron, visited LeLandais at Merkin's office. Although LeLandais and Stoutenburgh did not at that time enjoy cordial relations, Stoutenburgh, in order to obtain a favorable vote, desired to explain why the proposed merger was advantageous. What took place at this meeting is discussed below in connection with the claim of deception concerning "free stock" (*infra,* p. 28).

On February 26, 1971, Stoutenburgh, continuing his missionary efforts, met with an officer of Morgan Guaranty Trust Company, which owned 40,000 Atron private placement shares, purchased in September 1969. After Stoutenburgh's explanation, Morgan advised that it would support the merger, and voted 40,000 shares in favor.

Seven hundred four shareholders of record were entitled to vote 1,090,110 shares of Atron common stock, and under Minnesota law, the affirmative vote of two-thirds of the outstanding shares (726,740) was required to approve the merger. As previously noted, Mohawk, and the officers, directors and employee founders of Atron and Halsey, held approximately 455,250 shares. The proxy solicitation was mailed on April 16, 1971, and within ten days, Atron's transfer agent reported that it had received proxies voting 770,649 shares in favor of the merger, and only 2,740 shares against. There was then no known organized opposition to the merger, and all persons including LeLandais, Ladenburg and Morgan, who had or controlled substantial positions, had supported the merger.

*The "Free Stock" Deception.*

Plaintiffs seek to recover on two separate theories, the first of which is the so-called "free stock deception" theory. Briefly stated, plaintiffs claim that they were deceived by the written proxy solicitation materials (Exhibit 18), and also by oral representations made on behalf of defendants to plaintiffs either directly or through their group leader, LeLandais, into believing they would receive unrestricted Mohawk stock on the merger.

At the time of public announcement of the proposed merger, and thereafter, approximately 71% of the outstanding shares of Atron stock were restricted by investment letter. Nothing was said by Atron or Mohawk in the press release announcing the proposed merger about the effect, if any, of the

merger on these investment letter restrictions. The proxy statement, dated April 16, 1971, was received by all plaintiffs except ITNR, within a few days after its date and read. Plaintiffs found their argument in part on a contention that the proxy statement *"implicitly . . .* stated that all holders of Atron stock would receive freely transferable Mohawk stock" (Plaintiffs' Post Trial Memorandum, p. 8, emphasis added). There is no substance whatever in this argument. The provisions of the proxy statement, upon which reliance is placed, are found on pages 5 and 9 of the proxy statement. On page 5 it is stated that:

"Certificates for Atron common shares should be exchanged for Mohawk certificates prior to sale or disposition since Atron certificates will not constitute good delivery of Mohawk common stock on the New York Stock Exchange."

Plaintiffs claim that they inferred from this indisputably correct and relatively standard boiler plate language, that Atron was informing them that the transfer agent will exchange Atron certificates for Mohawk certificates which will be in form satisfactory for delivery in transactions with member firms, that is to say, unrestricted and without any legend. There is no basis for drawing this conclusion. Atron did have considerable unrestricted stock outstanding. The restrictions and representations contained in the investment letters are self-executing, wholly without regard to whether the certificates bear a restrictive legend. The restrictive agreements or investment letters were clear, and their traditional meaning well known to plaintiffs. The Atron stock had been held by plaintiffs for relatively short periods. Plaintiffs each had substantial experience in dealing with restricted stock purchased from other issuers. It was generally known in 1971 by such investors that a merger was foreseeable when the state of mind represented to exist in their investment letters came into being, and that the mere occurrence

of a subsequent merger is not one of the accepted changes of circumstances upon which counsel may found an opinion relieving parties to an investment letter therefrom and approving sale without registration. If plaintiffs drew the contrary inference subjectively, which they say they did from the provisions on page 5, that inference was unwarranted and unreasonable, and is no basis upon which to hold Atron or Mohawk liable for misleading proxy information released in violation of Rule 14a–9 or otherwise.

Plaintiffs also rely on those provisions of the proxy statement devoted to dissenters' rights under the statutes of Minnesota regulating the internal affairs of corporations. At page 9 of the proxy statement, Atron shareholders are informed that dissenters may obtain "the fair cash value" of their shares. No distinction is made between restricted and unrestricted Atron stock in this paragraph, and plaintiffs assert that because the information concerning dissenters' rights "does not state that fair cash value would be reduced as a result of any transfer restrictions," the reasonable reader is entitled to infer that in appraising dissenters' stock, all would be considered unrestricted. This latter proposition appears valid. We are cited to no provision of Minnesota law which would permit or require that stock of a dissenter, restricted as to transferability, would be valued less than unrestricted stock. In a proceeding to appraise the shares of dissenters in New York, mere market value, concededly higher where a corporation is publicly traded, for unrestricted stock than for restricted shares, is not the sole criterion in fixing value, nor is it even a major factor. Most courts applying statutes *in pari materia* with the Minnesota provisions, have long held that the value of shares where dissenters' rights are exercised in connection with a corporate merger is their full and fair investment value, taking into consideration that:

"Offers for merger and consolidation are likely to be made to a corporation

and accepted by it when the market price of its stock is depressed in relation to certain other valuation criteria . . . . Therefore, limiting the dissenter to the market price of his shares may enrich the majority at his expense. * * * [T]he theory of the dissenter's claim is that he desires a continuation of his investment unaffected by the change.

The resultant valuations have generally concentrated on three principal elements: (1) net asset value; (2) market value; and (3) investment (or earnings) value. Most courts have considered all three. . . ." 79 Harv.L.Rev. 1456–7, Valuation of Dissenter's Stock (1966).

See also 15 Fletcher Cyclopedia Corporations, 1973 Revised Volume, § 7165.4, p. 294:

> "The courts must determine the value of the shares of dissenting stockholders. . . . Appraisal must be upon a going concern basis rather than upon a liquidation basis.

> While there is no legal formula which can be enunciated or applied in valuation proceedings, the appraisal remaining a matter of judgment on the facts in each case, the court can reiterate accepted principles, which simply stated, are that the appraisal should take account of market value, investment value, and net asset value."

■ In the absence of authority to the contrary, we conclude that the Minnesota law is to the same effect, and that in a dissenters' proceeding, restricted shares would receive the same payment as would be given to unrestricted shares. Indeed, to hold otherwise would seem to permit undue oppression of shareholders who had in good faith purchased unregistered shares with the intent of holding a long term investment position in the issuing corporation. Such investors, to the extent that they were holding for the long term investment, or going concern value of their shares, were not prejudiced by the presence of the restriction unless there were a merger.

■ LeLandais also contended at the trial that because page 5 of the proxy statement imposed a condition precedent to the merger, that the new Mohawk common stock to be issued to effect the merger be listed on the New York Stock Exchange, he inferred that such listing meant that each individual share certificate so issued must be freely marketable. In his testimony (Tr. p. 202) he conceded however, that this limitation meant that "it is freely marketable unless the holder of that security has agreed in writing that it is not freely transferable." Each plaintiff had so agreed in writing.

The Court considers the proxy statement not misleading with respect to the free stock deception claim, and believes that if any of these plaintiffs drew the inference therefrom which they say they did, it was entirely unwarranted, and may not be a basis for fastening liability on defendants.

*Oral Misrepresentations.*

■ As an independent basis urged in support of the "free stock deception" theory, plaintiffs rely on oral communications said to have been made to them through LeLandais.

LeLandais testified, and I find, that he wrote Exhibit 28, a letter dated April 19, 1971, on the letterhead of Merkin & Co., directed to those Atron shareholders whom he or his prior firms had served, and that he did so prior to receipt of the proxy solicitation materials dated the same day. In his letter, he withdrew somewhat from the position of his February 5, 1971 letter and advised his followers that "the proposed merger . . . is to the best interests of all of the Atron Stockholders and to you as one of the participants in the Private Placements of securities which I effected and, therefore I strongly recommend that you vote in favor of this merger." He testified that the letter was "trig-

gered" by a disputed telephone conversation he claims to have had with Stoutenburgh on the same date. LeLandais' version of the telephone conversation is as follows [Tr. p. 205]:

"A  Mr. Stoutenburgh said, 'Pierre, I would like you to do me a favor.' I said, 'What can I do?'

He said Ladenberg-Thalman was against the merger and he was afraid that unless he received enough proxies, the merger would not go through. And he said, 'If you really want your participants in your private placements to receive their free stock, you had better canvas them and get them to send their proxies in voting in favor of the merger.'

Q  Was anything more said to the best of your recollection?

A  I mean that's what I recollect of the conversation.

Q  After April 19, 1971, but before April 30, 1971, did you have any discussions with either Mr. LePow, Mr. Ludt or Mr. French which related to the proposed merger in any way?

A  Yes.

Q  Did you speak with all of those gentlemen at different times?

A  Yes.

Q  And did you relate to all of those gentlemen the substance of your conversation with Mr. Stoutenburgh?

A  Yes."

The April 19, 1971 letter does not state expressly or implicitly that any representation had been made by Mohawk to the effect that Atron restricted shareholders would receive unrestricted Mohawk stock. The letter thus makes no mention whatsoever of what is now testified by LeLandais to be the sole cause for writing it. The Court finds this testimony incredible. Plaintiffs have not proved to my satisfaction that the conversation with Stoutenburgh took place as claimed. There is no corroboration for the conversation, and competent credible evidence exists directly to the contrary.

LeLandais testified that between April 19th and April 30, 1971, he related the substance of his claimed conversation with Stoutenburgh to LePow and Ludt. LePow's corroboration of LeLandais' testimony concerning the oral representation of April 19th, claimed to have been made by Stoutenburgh, is extremely weak. He testified (p. 16) that they "rediscussed or discussed us getting free stock in the merger." LePow admits (p. 31) that there was nothing in the proxy statement which "led me to believe it one way or the other," with respect to whether the Mohawk stock to be received in exchange would be free of the investment letter restrictions. Ladenburg's opposition to the merger, said to have been the cause expressed by Stoutenburgh for his concern, had collapsed a month before the claimed telephone call.

LePow admitted again (p. 49) that there was nothing in the proxy statement which indicated that Creative would or would not receive freely transferable Mohawk stock.

Ludt testified (Exhibit 35, p. 19) that he spoke with LeLandais only once concerning the proposed merger. His testimony was as follows:

"A  Well, essentially the subject of the conversation was on interpretation of what the intent was with respect to the shares that the Atron shareholders would receive from Mohawk Data.

Q  What was your understanding?

A  My understanding was that we would get freely negotiable shares.

Q  In return for the restricted shares you held in Atron?

A  Yes.

Q  Had you arrived at that understanding totally on your own efforts or through conversations with other people?

A  Well, I arrived at that understanding by reading the proxy statement, and I wanted to confirm my understanding, and I talked to Pierre as to whether this was the intent, and I received an affirmative reply.

Q  Can you recall more specifically what Mr. LeLandais told you?

A  He said that we would get free stock, freely negotiable stock.

Q  Did Mr. LeLandais tell you how he knew that?

A  Well, the language of the proxy statement, in my judgment, makes this quite clear.

Q  Did Mr. LeLandais tell you what made it quite clear to Mr. LeLandais?

A  I think the same language and conversation which I think he had with the Atron people.

Q  Did he specifically refer to conversations that he had with Atron people?

A  I think he was in fairly frequent conversation with them.

Q  Did he specifically tell you that he had spoken to Atron people?

A  I would have to say, no."

If in fact a seasoned stockbroker such as LeLandais had received the bald representation or interpretation which he claims to have received from Stoutenburgh, and later the written proxy solicitation materials did not bear this out, one would think it would be normal and ordinary procedure for him to have given Ludt the substance of his discussions and perhaps it is not too much to expect that he would have confirmed it in writing to LePow and Ludt as well as Atron.

LeLandais' pre-trial deposition with which he was confronted (p. 227, et seq.) is inconsistent with his trial testimony that he had imparted the good news to LePow and Ludt. I conclude that he was testifying more accurately on his pre-trial deposition than at trial, and decline to accept his testimony that he informed LePow and Ludt of the claimed oral representations made to him by Stoutenburgh.

On his deposition with respect to the claimed telephone conversation of April 19th, LeLandais testified that Stoutenburgh had called him. At trial he disclaimed memory as to whether he had called Stoutenburgh, or whether Stoutenburgh had called him. Confronted with his prior testimony, he qualified his position (p. 235) "when I talked to him [Stoutenburgh] I don't know whether it was the call he initiated, or whether it was my secretary that returned the call to him. But obviously *the first call came from Mr. Stoutenburgh* if there were two calls."

Joan Kane, formerly secretary to LeLandais, showed an entry on Monday, April 19th, in a desk diary kept in Merkin's office, which reads "Stoutenburgh Re: Proxy material." She says that this entry reflects a call from Mr. Stoutenburgh to Mr. LeLandais in which Stoutenburgh told Kane that he wanted to speak to LeLandais regarding proxy material, to which the witness responded in substance, "thank you, I will tell him." At most, the entry shows that Stoutenburgh was trying to reach LeLandais on the telephone on April 19th. Stoutenburgh testified that during the period between the agreement to merge and the shareholders meeting, he believed that Atron shareholders, with the exception of the promotors, would receive freely transferable Mohawk stock.

Personal bitterness existed between LeLandais and Stoutenburgh, and each held the other in low esteem because of an unrelated matter. Stoutenburgh testified (p. 256) that he visited LeLandais in person on February 17th, "as much as I desired not to have any dealings with Mr. LeLandais." He believes that in that meeting he indicated to LeLandais the attitude of Mohawk management that they would give unrestricted shares if they could. He testified that he had no recollection of speaking to LeLandais in April of 1971, and during the period "there was every reason not to have called Mr. LeLandais." (Tr. p.

269). He had been assured that the merger vote would be favorable, so he didn't need the aid of LeLandais. It is indisputably established that Stoutenburgh was in his office at Minneapolis, Minnesota on April 19th. Merkin's phone number does not appear on his call charges for that date. I am satisfied upon the entire record before me that no call came from Stoutenburgh to the witness on April 19, 1971.

Mr. LeLandais was confronted again with his pre-trial deposition (Tr. p. 236), and did not repudiate the testimony:

"Q Mr. Stoutenburgh said to you that the private investors would be able to sell after the merger?

A I don't think he put it that way.

Q How did he put it?

A As I said, I told him I was in favor of a merger only for one reason, and that is to provide a way for my stockholders to get out. And he said, 'Well, if we don't get the votes from your stockholders they won't be able to get out.' "

The witness did not ask Mr. Stoutenburgh what he meant by "get out" (Tr. p. 236), he merely assumed that it meant they would receive readily salable unrestricted shares without legends on the certificates. This may well have been an unjustified assumption. Stoutenburgh's conversation is equally susceptable to the inference, warranted by facts known to both parties to the alleged conversation, that Atron, incurring a monthly loss of $200,000.00, faced with loss of the customer responsible for 90% of its sales, terminating purchases, and incapable of developing other markets successfully, was in serious danger, and without recourse to this merger or some alternative merger, the shareholders would not be able to "get out", and the entire investment would dribble away in operating losses.

In addition to relying on the claimed conversation with Stoutenburgh, plaintiffs seek to rely on conversations between LeLandais and John Halsey.

Halsey was employed by Merkin & Co. during most of the proxy solicitation period. LeLandais knew Halsey to be Stoutenburgh's brother-in-law, and discussed the subject of free stock with Halsey during that period "many times." However, during that period, although Halsey was a paid proxy solicitor for Atron, LeLandais did not know this fact (Tr. p. 209), and accordingly was not dealing with Halsey in any respect as an agent of Atron or defendants upon whom he or his group could rely. There was motivation to withhold from LeLandais the fact that Halsey was acting as a paid proxy solicitor for Atron because this employment was presumably inconsistent with Halsey's obligations as a full-time employee of Merkin. If Halsey did say anything to LeLandais about free stock, such representations as he might have made may not be imputed to these defendants, or relied on.

LeLandais disclaims any conversation with anybody at Mohawk prior to the effective date of the merger with respect to whether or not Mohawk would be issuing unrestricted certificates to Atron private placement holders (Tr. p. 255).

During the January 29, 1971 meeting, Stoutenburgh raised the question with Mohawk, whether holders of restricted Atron stock would receive freely transferable Mohawk stock should a merger take place, and Wells or Rifenburgh, speaking for Mohawk, gave what Stoutenburgh considered to be an expression of attitude to the effect that "they would issue free stock if they could." (Tr. p. 362).

This fairly stated the attitude and position of Mohawk management, as subsequent events illustrated. Stoutenburgh, Wells and Rifenburgh understood that the problem involved legal matters. There was no discussion in the January 29th meeting of registering the Mohawk stock to be issued in connection with the merger.

Stoutenburgh had no further discussions with Mohawk as to whether Atron restricted shareholders would receive

freely transferable stock. He explained (Tr. p. 264): "I had no other occasion to really do that. They made an expression of attitude. It was simply a matter if legal determinations permitted, free shares would be issued."

On April 30, 1971, Stoutenburgh believed that with the exception of officers, directors and promoters of Atron, free shares would be received. He, as a founder and promoter, was not so benefitted, and at the closing of the merger signed a further restrictive agreement as a promoter. It was not until May 10, 1971, after the merger had been completed that he learned that restricted shareholders of Atron, other than officers, directors and promoters, would not receive freely transferable Mohawk stock.

On May 10th, after the merger, LeLandais raised the problem of transferability of Mohawk shares. Stoutenburgh testified, "I told him that I didn't know anything about it, please contact Mohawk. They are the only people that can answer the question." He testified, and I believe, that this was the first time he learned of any difficulties with respect to receipt of freely transferable Mohawk stock by former Atron shareholders other than promoters.

In conclusion, there is a complete failure of proof with respect to plaintiffs' contentions that the proxy statement was misleading, or omitted to state material facts necessary in order to make the statements therein not misleading, with respect to the question of whether restricted shareholders of Atron would receive unrestricted shares of Mohawk in the merger which could be sold in market transactions without registration under the Securities Act of 1933. Also, plaintiffs failed to prove any cause of action arising out of the restrictive legends placed upon their Mohawk share certificates. This result follows whether their claim be viewed as a violation of Rules 10b–5 or 14a–9 under the 1934 Act, or common law fraud or otherwise, and whether alleged in reliance on oral representations of Stoutenburgh, or oth-

ers, or written misrepresentations, or omissions in the proxy statement. As to this branch of the litigation, defendants are entitled to prevail in all respects.

*The "Accounting Change Deception".*

■ This aspect of the case finds plaintiffs on firmer ground. The proxy statement dated April 16, 1971 remained in effect until the close of the shareholders meeting on April 30, 1971 at which the proxies solicited thereunder were voted in favor of the merger. As was held in Gould v. American Hawaiian Steamship Co., 351 F.Supp. 853, 868 (D.Del.1972), cited with approval in Chris-Craft Industries, Inc. v. Piper Aircraft Corp., 480 F.2d 341 (2d Cir. 1973):

> "Rule 14a–9 specifically requires that solicitation material which has become false or misleading must be corrected by subsequent materials. Thus, assuming that the . . . proxy materials were accurate when initially approved, the proxy materials should have been amended to reflect subsequent occurrences or changes which rendered the initial disclosure false or misleading. Insofar as they knew or ought to have known that facts originally disclosed subsequently became inaccurate, the directors were under a continuing obligation to make certain that the proxy materials were amended and remained complete and accurate."

The proxy statement furnished plaintiffs contains all of the usual materials needed in order to permit consideration of a corporate merger. Specifically, these include comparative net income statements, comparative book values, dividend records, statement of operations, consolidated statement of income of Mohawk and its subsidiaries, a *pro forma* combined operating statement of Mohawk plus Atron, as well as the comparative historical profitability records of the constituent corporations and financial statements.

Note J to the financial statements, found beginning at page 46 of the proxy

statement, disclosed that Mohawk had rented certain equipment to its customers for various periods and, commencing in 1970, had sold this equipment subject to the leases, to non-affiliated third parties for approximately $4,100,000.00. In the event that the lessees returned the equipment, cancelled their leases or for bad credit or other reasons failed to perform their obligations to make payment, Mohawk had the opportunity to assign substitute leases to the non-affiliated third parties, or substitute equipment leased to the same lessees. In addition, after the expiration of a five year period, the Company would participate in future rentals and have an option to repurchase at salvage value, any or all of such units sold. The proceeds of such "sale", subject to a reserve for doubtful accounts, was booked as an item of revenue in the year in which the sale of the leased equipment to such non-affiliated third parties was made. As of the date of the proxy statement, and previously, this method of accounting, the so-called "financing method" was one of two generally accepted and appropriate principles of accounting for the revenue received by a lessor of property such as Mohawk.

The other generally accepted method was known as the "operating method." The difference between these two accounting methods is that the financing method in effect recognizes the lease, even when not sold to the third party lender, as a sale or loan transaction. The operating method, on the other hand, accounts for revenue from a lease solely as a rental transaction.

Under the financing method, the *excess* of the total rentals to be received under the lease, over the manufacturers' cost of the leased equipment, after giving effect to an adjustment for *residual* value at the end of the lease, is considered as the consideration payable to the lessor for the investment he has made in the property. Since the transaction is treated as if it were a loan or a sale on the installment basis, that *excess* is taken into account on the accrual basis as

profit in the year made, and in periodic amounts on a declining basis depending on the unrecovered cost of the investment of the lessor. See explanation of the expert witness Rosner, Tr. p. 454, et seq. The effect is to bulk a larger portion of the profit via the financing method in the first or early periods of the lease.

Where the operating method is used, the rentals are taken in as accrued as general revenue, and there is charged to the income account of the lessor, or the profit and loss account, any costs of the leased property, such as depreciation of its original cost, maintenance, repairs, bad debt expense and related items. The difference between the rent and these depreciation, maintenance and related costs is the net profit reflected in the income account applicable to the lease itself for the period in which the rent is accrued.

Both accounting methods were in accordance with accepted principles of accounting in 1970 and 1971.

At least prior to November 1971, it was also permissible after a lease had been effected, and booked under the financing method, to "sell" the transaction to a third party. Such third party sales gave rise to income booked in the year of effecting sale, equal to the *full amount* of the entire aforementioned *excess*, or the net rewards to be expected from the leased property over its entire life, with a suitable provision for a reserve for uncollectability or rejection of the leased equipment prior to termination of the lease. This had the practical result of booking as current income monies which in truth could not be said to have been earned fully until some future time when the lessee had fully performed its obligations with respect to the machinery.

Many prestigious corporations engaged in the leasing of equipment and represented in their fiscal affairs by skilled accountants of the highest level of learning and ability, were booking their revenues in accordance with the fi-

nancing method. These concerns were in effect reporting high profits, in fiscal years prior to full perfomance of obligations, their own and customers, to be performed in the future.

Because use of these accounting principles, permitted by Accounting Principles Board Opinion 7, effective after December 31, 1966 ("APB No. 7") seemed to present an unrealistic picture of the true operating results of corporations manufacturing equipment for sale or lease, the practice came into some disrepute among conservative accountants, beginning earlier than 1971. For example, an "Accounting Interpretation on APB No. 7", issued by the staff of the American Institute of Certified Public Accountants, Inc. (hereinafter the "Institute"—the body which issues APB's) and published in the Journal of Accountancy for November 1971, shortly after the merger, says (p. 78):

> "[T]he sale to a financing institution of property subject to an operating lease, with the manufacturer or dealer effectively retaining the risks of ownership, is not a sale in substance and, therefore, should not be reflected as a sale. Instead, the transaction should be reflected as a loan and income should be recognized under the operating method. (Transactions of these types are in effect collateralized loans from the financing institution to the manufacturer or dealer.) However, the sale of property subject to an operating lease should be reflected as a sale if all risks and rewards of ownership are transferred to the purchaser."

Although the above opinion, clearly critical of the theretofore permissible practice of Mohawk, was not issued until after April 30, 1971, both Mohawk management and its accountants knew that the practice had become subject to professional criticism prior to April 16, 1971, and there had been discussions about changing to the operating method. Neither the existence of the problem, nor the discussions concerning the change were communicated to Atron or plaintiffs prior to the merger, nor were they referred to in the proxy statements.

When a corporation changed from the financing method to the operating method, it would restate its historical income downward, and the amount by which the past income was restated downward would be available to be booked again, when realized, that is, added on to future income. As the expert witness Rosner pointed out (Tr. p. 467): "The profit is still there. It is primarily a question when you record the profit." The profit will be recorded earlier under the financing method.[5]

It is accepted accounting practice to present comparable financial statements for two or more consecutive years. Unless the prior statements were adjusted retroactively, they would not be comparable in the case where a change of accounting principle has been made. Accordingly, it is universal practice where such an accounting change is made, to adjust the prior period retroactively so that the two financial statements will be comparable.

Prior to 1971, Mohawk's fiscal year had ended on July 31st. In 1971, it advanced its fiscal closing from July 31, 1971 to April 30, 1971, so that the nine-month period ending April 30, 1971 constituted a fiscal year, coinciding with the effective date of the merger with

5. Again, at p. 472, the witness pointed out that when a reporting company shifts or changes from the financing method to the operating method of accounting for leased equipment, it decreases its otherwise reportable earnings for the period in which it makes the change and for the prior periods, and its future earnings will be greater than they would have been if it had continued to use the financing method and all other aspects of its business had remained the same. As the witness expressed it, "what had previously been reported as income is adjusted downward, and the income that had previously been recorded is in effect credited to a reserve account and subsequently in future years that income is taken into future income *pro rata* over the life of the lease."

Atron, and with the change in accounting for "sales" of leased machines.

Mohawk effected these two changes as of the close of business on April 30, 1971. There was no disclosure whatsoever of the intended changes in the proxy statement, which spoke as of that date, nor did any of these plaintiffs know about the change when they voted their proxies.

I find that either of the accounting changes taken alone was material, and a failure to disclose them was a material omission. Taken together, the materiality is greater than for either change taken alone. Also material is a statement by management of the reasons or a statement of the operative facts which impelled the changes. See 17 C.F.R. §§ 240.14a–3, 240.14a–101.[6]

Long prior to April 30, 1971, doubts had arisen in the minds of the persons charged with the responsibility for Mohawk's accounting procedures as to the appropriateness of continuing to use the financing method and third-party sales reporting in effect, instant profits from long term leases. Premature terminations of leases which had been the subject of third-party sales had exceeded Mohawk's original expectations by a substantial amount. In addition, certain third-party transactions had not provided the entire sales proceeds in immediate cash for Mohawk. It was report-

ing these sales as instant earnings, although not receiving the cash flow which the casual reader of a financial statement would associate with the amount of dollars in sales booked during the period.

Wells, Executive Vice President and Treasurer of Mohawk and Rifenburgh, who was President of Mohawk, had, within the scope of their authority, decided, as early as March, 1971, that they would change Mohawk's fiscal year from July 31st to April 30th, and make the change effective for fiscal 1971, so that that year would end three months early. This change in the fiscal year had been approved by the Board of Directors of Mohawk, but the decision to change the fiscal year was not disclosed publicly or announced until May 4, 1971, when it was contained in a press release (Exhibit XY). This change in the fiscal year had various purposes, among which were (a) to facilitate a change to the operating method of reporting earnings, (b) to apply a cosmetic treatment to adverse earnings for the current period, and (c) to eliminate bookkeeping inconveniences suffered with respect to a July 31st closing (Ex. 22). In addition, management wanted to have the new fiscal year coincide with the introduction of a new product line, and put behind itself a period of flat earnings. In order to effectuate the change in Mohawk's fiscal year, its certified public accountants be-

---

6. 17 CFR § 240.14a–3 provides:
   "No solicitation subject to §§ 240.14a–1 to 240.14a–11 shall be made unless each person solicited is concurrently furnished or has previously been furnished with a written proxy statement containing the information specified in Schedule 14A."
   The instructions for preparation of Schedule 14A are to be found at 17 CFR § 240.14a–101, Item 14, regarding *inter alia*, mergers, require that the proxy statement:
   "(b) Furnish the following information as to the issuer and each person which is to be merged into the issuer or into or with which the issuer is to be merged . . . . What is required is information essential to an investor's appraisal of the action proposed to be taken."
   In addition, Item 17, entitled "Restatement of Accounts," provides:

"If action is to be taken with respect to the restatement of any asset, capital, or surplus account of the issuer, furnish the following information:
   (a) State the nature of the restatement and the date as of which it is to be effective.
   (b) *Outline briefly the reasons for the restatement and for the selection of the particular effective date.*
   (c) State the name and amount of each account (including any reserve accounts) affected by the restatement and the effect of the restatement thereon . . . .
   (d) To the extent practicable, state whether and the extent, if any, to which the restatement will, as of the date thereof, alter the amount available for distribution to the holders of equity securities." (Emphasis added)

gan the audit earlier than usual and before April 30, 1971. They did so pursuant to management's direction.

In March 1971, Wells and Rifenburgh also decided that commencing May 1, 1971 Mohawk would discontinue the practice of third-party sales. This in itself was a substantial change in the nature of Mohawk's business and should have been disclosed in the proxy statement. It was revealed in an interview with Reuter's News Service on April 19, 1971, but is not set forth in the proxy statement, and no press release was issued prior to the shareholders' meeting on April 30th. There is no evidence that plaintiffs had actual or imputed knowledge of that change.

A day or two following April 22nd, and prior to the shareholders' meeting, the certified public accountants approved and recommended the change from the financing method to the operating method. On April 28, 1971, again prior to the meeting, management's decision had crystallized to the point that Mr. Hengen, Mohawk's public relations officer, was asked to draft an outline for the press release to be issued in conjunction with a meeting with security analysts to be held on May 4th. Additional conversations were held between Wells and Hengen between that date and April 30, 1971. The press release, formally issued on May 4, 1971, but prepared prior to April 30th, discloses the intended change in accounting methods.[7]

The change in accounting alone resulted in a restatement of Mohawk's prior fiscal period ending July 31, 1970, by which revenues were decreased 4%, net income was decreased 18%, and net income per share was dropped $.50 from $1.52 to $1.02. For the short fiscal period of 1971, the income was reduced in the amount of $1,000,315.00. In addition, other miscellaneous adjustments reducing Mohawk's net income substantially were not disclosed in the proxy solicitation material, although mentioned in the May 4, 1971 press release.

The Court believes that these omissions, all considered together, were material. Income, and earnings per share, traditionally have been considered material in fixing the price or value of stock. Prices of shares are ordinarily quoted in terms of a price-earnings multiple. While sophisticated securities analysts, such as Mr. O. Seaburn Eaton, who testified at the trial, have become accustomed to treating historic earnings statements of electronic data processing equipment companies with a degree of cynicism (Tr. p. 336), these changes were of sufficient magnitude that they should have been disclosed in the proxy statement.

7. By the Agreement and Plan of Merger dated as of March 12, 1971 (Exhibit No. 15) signed by Mohawk, Mohawk expressly warranted to Atron in part as follows:

"3. [Mohawk] has delivered to Atron (a) its consolidated balance sheet as at July 31, 1970, consolidated statements of income and capital in excess of par value and retained earnings for the year then ended and consolidated statement of funds for the year then ended, together with a report of S. D. Leidesdorf & Co., independent public accountants, with respect to such financial statements, and (b) its consolidated balance sheet as at October 31, 1970 and consolidated statements of income and capital in excess of par value and retained earnings for the three months then ended, prepared by [Mohawk]. *Said financial statements and related notes are correct and complete in all material respects and fairly present the financial position (including all known contingent liabilities) of [Mohawk] and its subsidiaries as at the date of each balance sheet and the results of its operations and its use of funds for the respective periods covered by such financial statements.* Such financial statements have been prepared in accordance with generally accepted accounting principles consistently applied throughout the periods involved. Since October 31, 1970 there has been no change in the business, financial condition or results of operations of [Mohawk] except changes in the ordinary course of business which in the aggregate have not been materially adverse or changes which are specifically permitted or required by this Agreement or to which Atron may consent in writing or changes of which [Mohawk] has advised Atron in writing prior to the execution hereof." [Emphasis added]

In a nondisclosure case under Rule 14b–9 as well as Rule 10b–5 [8] plaintiff must show "that the facts in question were material 'in the sense that a reasonable investigator might have considered them important' in making his investment decisions." Schlick v. Penn-Dixie Cement Corp., 507 F.2d 374 (2d Cir., 1974). See also, Chris-Craft Industries, Inc. v. Piper Aircraft Corp., 480 F.2d 341, 374 (2d Cir. 1973).

The Court finds that the totality of omissions was material in that plaintiffs, other than ITNR, might have acted differently in connection with the merger. The only thing they could do was to vote "Yes" or "No". Their sole remedy to avoid receiving Mohawk stock which might have appeared unattractive with its earnings restated, would have been to vote "No," and demand an appraisal under the Minnesota statute.

No proof of reliance is necessary in an omission case [Affiliated Ute Citizens v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 471 (1972); Mills v. Electric Auto-Lite Co., 396 U.S. 375, 385 (1970)], and the Court finds that plaintiffs, other than ITNR, have proved all of the elements of their cause of action based on the misleading omission of the accounting and operating information hereinbefore mentioned, and are entitled to recover their provable damages upon that claim.

*Damages.*

Neither side of this litigation has presented persuasive evidence of the true value of Atron common stock as of April 30, 1971, contrasted with market price.[9] On that date the average bid and asked quotations for Atron were 10¾ and 11¼. On January 29, 1971, when the merger was agreed to and announced, the average price of Mohawk stock was $29.00, and Atron was $8.00.

On March 12, 1971, the date the Agreement of Merger was signed, Mohawk was $34.38 and Atron $7.80. April 16th, the date of the proxy notice, Mohawk was $39.75 and Atron $9.25. On April 30th the relative prices were $44.63 and $10.94.

The Directors of Mohawk, who owed a fiduciary duty to their corporation and its other stockholders, had concluded that the value of Atron was $8.60 per share when they agreed in writing on March 12, 1971 to give a quarter share of Mohawk, then selling at $34.38 per share, for each share of Atron. This agreement, openly arrived at, and negotiated at arms length, at least insofar as Mohawk was concerned, was effected under such circumstances as to estop Mohawk equitably from denying in this action that Atron stock had a value of at least $8.60. There is no persuasive evidence to support any greater value, and the April 30th price of Atron appears solely to have resulted from arbitrage. We consider the intrinsic or investment value of Atron, without regard to any benefits flowing from the Mohawk merger. See discussion *supra,* p. 19.

The measure of damages is compensatory. Plaintiffs are entitled to be placed in the same position they would have enjoyed had they received the omitted information in the proxy statement, and had they voted against the merger, and pursued their dissenting shareholders' rights of appraisal. While the statutory appraisal proceedings would have incurred expenditures for experts and legal fees, as a practical matter, the plaintiffs have incurred at least the same expenses in this litigation, so there is no need to adjust dam-

---

8. Certain controlling principles applicable to cases arising under Rule 10b–5 have been held applicable to cases arising under the proxy regulations. See Shapiro v. Merrill Lynch Pierce Fenner & Smith, Inc., 495 F.2d 228, 235 (2d Cir. 1974), and cases cited in footnote 12 therein.

9. Market price of Atron was affected by principles of arbitrage. Any practical investor knew the merger was most likely to be approved and effected—a fact reflected by the market. The greater the certainty and the nearer the date, the greater the arbitrage effect.

ages to account for the costs of obtaining the remedy in the Minnesota state courts.

It would be speculative and unjustified to assume that the merger would have been defeated if these shares had been voted in the negative. Defendants concede that the merger would have been effected nonetheless. (Post Trial Memorandum, p. 165).

■ Nor can we accept defendants' contention that without the merger the Atron stock had "for all practical purposes, no intrinsic worth whatever" (*ibid*, p. 165). While Atron's prospects were not good, it could have been merged with some other concern or liquidated, and Mohawk is equitably estopped, as previously noted, to deny that Atron was worth the value it paid or gave to acquire the merged company.

I decline to find that the changes in accounting methods or the discontinuance of third-party sales or any combination of such events, was the cause in the decline in price of Mohawk stock between May 3, 1971 and August 25, 1971, the date of filing of the Registration Statement. This decline was caused by a myriad of independent factors operating together, affecting the stock market in general, and computer shares in particular. However, the losses which the plaintiffs suffered do meet the test of causation set forth in *Schlick, supra,* which held that both

"*loss causation*—that the misrepresentations or omissions caused the economic harm—and *transaction causation*—that the violations in question caused the [plaintiff] to engage in the transaction in question" (507 F.2d at p. 380)

must be shown

"in order to state a Section 14(a) claim: transaction causation to show a violation of the law from which [a plaintiff] may recover, and loss causation to show damages." (507 F.2d at p. 382)

■ The omissions, as we have held, violated the proxy rules and the regula-

tions promulgated thereunder. But for such violation, plaintiffs might have voted against the merger, exercised their appraisal rights as dissenting shareholders, and avoided damage. Such "but for causation" is a sufficient basis to fasten liability. *Cf.* Pearlstein v. Scudder & German, 346 F.Supp. 443 (S.D.N.Y. 1972), on remand from order in 429 F. 2d 1136 (2d Cir. 1970).

■ Coronet effected a short sale on May 5, 1971 (Pre-Trial Order, ¶ 33). It realized a profit when it covered the short sale. It did this inadvertently, and acting in the mistaken belief that it was selling the freely transferable shares of Mohawk which it expected, unjustifiably, to receive as a result of the merger. The Court gives no consideration in fixing damages to the profit realized on the short sale. If plaintiffs' free stock deception theory were sustained, we would credit this amount as the result of action in mitigation of damages. However, Coronet was acting as a result of an inexcusable mistake. It knew or should have known its Mohawk shares were restricted. Had it suffered a loss in covering the May 5th short sale, such loss would not have been chargeable to the defendants here, since the Court does not sustain the free stock deception theory. Accordingly, equitable principles require that we treat the profit realized on the short sale no differently than we would have treated the loss. The same conclusion applies to the short sale profits of plaintiff RSI (Pre-Trial Order, ¶ 34).

■ The Registration Statement became effective August 25, 1971. At that time, plaintiffs came under an obligation to mitigate their damages arising out of their acquiescence in the merger, which the Court finds to have been caused by a misleading proxy statement. A thirty day period following August 25th would seem to represent a reasonable time within which plaintiffs should have disposed of their Mohawk shares so as to mitigate their damages, and any plaintiff holding Mohawk shares after September 25, 1971, is considered by the

Court to have made a new investment decision. *Cf. Pearlstein, supra.*

The lowest price during that period for replacement was $21.50 per share.[10]

We compute and award damages as follows:

Coronet:

| | |
|---|---|
| Value of 21,250 shares Atron at $8.60 = | $182,750.00 |
| Value of 5,312 shares Mohawk at $21.50 = | –114,208.00 |
| Damages | $ 68,542.00 |

Creative:

| | |
|---|---|
| Value of 16,250 shares Atron at $8.60 = | $139,750.00 |
| Value of 4,062 shares Mohawk at $21.50 = | – 87,333.00 |
| Damages | $ 52,417.00 |

RSI:

| | |
|---|---|
| Value of 10,000 shares Atron at $8.60 = | $ 86,000.00 |
| Value of 2,500 shares Mohawk at $21.50 = | – 53,750.00 |
| Damages | $ 32,250.00 |

LeLandais & Co.:

| | |
|---|---|
| Value of 6,334 shares Atron at $8.60 = | $ 54,472.40 |
| Amount realized September 9, 1971 on sale of 1,583 shares Mohawk (Pre-Trial Order, ¶38) | – 43,250.00 |
| Damages | $ 11,222.40 |

It is of no significance that of Coronet's shares, 5,000 are still held. There is no basis for any rescission in this case, and Coronet will be amply compensated by money damages representing the difference between the value of its Atron stock and the value of its Mohawk shares on the date when it should have acted in mitigation of damages. Any damages suffered since that date are deemed the result of an independent cause, or a new investment decision to retain the Mohawk shares. Compensatory damages for loss, of which the breach of statutory duty is the proximate cause, will be adequate. *Cf. Pearlstein, supra.*

■ As heretofore noted, ITNR shares were not voted either for or against the merger. The failure of ITNR to vote either (1) against the merger, so as to be entitled to appraisal under the Minnesota statutes, or (2) for the merger, so as to be entitled to claim that it suffered damages as a result of the false and misleading proxy statement, bar any recovery on its part. Breach of the duties imposed by Rule 14a–9 were not the proximate cause of its damages.

Recovery shall be joint and several as against Atron, MDS-Atron, and Mohawk, each of which is regarded as a joint tortfeasor with respect to the violations found.

Defendant Stoutenburgh is entitled to a judgment of dismissal for lack of personal jurisdiction.

Defendant Richard L. Karpen, a director of Atron and a Vice President and director of Mohawk during 1971, showed affirmatively to my satisfaction that his conduct was free of wrongdoing. The complaint is dismissed as against him for failure of proof.

■ The Court declines as a matter of discretion to award counsel fees, believing that the damages hereinbefore set forth are adequate to compensate plaintiffs under all of the circumstances of this case, and further because the litigation has been unduly complicated and extended by plaintiffs' act of joining the free stock deception theory claim, which the Court finds lacking in merit, for trial with a relatively simple and clear cut claim under Rule 14a–9. In so doing, plaintiffs imposed greater burdens on the defendants and the Court than would have been the case if the portion of the claim which the Court finds meritorious had been asserted alone.

The foregoing, together with the stipulated facts set forth in the pre-trial order shall constitute the findings of fact and conclusions of law in this case pursuant to Rule 52, F.R.Civ.P.

10.  Coronet sold 312 shares of Mohawk on November 9, 1971 at $5,970.17. Creative sold 4,062 shares on November 30, 1971 at $60,-459.36, and RSI sold 2,500 shares during November, 1971 at $41,260.20, LeLandais & Co. sold 1,583 Mohawk shares on September 9, 1971 for approximately $43,520.00 (Pre-trial Order, p. 15).

Our Clerk is directed to enter Judgment in favor of the plaintiffs jointly and severally against MDS-Atron, Inc. and Mohawk, only in the amounts set forth on p. 52, *supra,* all with interest at 6% per annum from April 30, 1971 to the date of entry of Judgment, and costs, all pursuant to Rule 58(1), F.R. Civ.P., and shall also enter Judgment that all relief shall be denied to plaintiff ITNR, and dismissing as to defendants Stoutenburgh and Karpen.